GROSJEAN, SUPERVISOR OF PUBLIC ACCOUNTS
OF LOUISIANA, *v.* AMERICAN PRESS CO., INC.,
ET AL.

No. 303. Argued January 14, 1936.—Decided February 10, 1936.

*Mr. Charles J. Rivet,* with whom *Mr. Gaston L. Por-
terie,* Attorney General of Louisiana, was on the brief, for
appellant.

*Messrs. Esmond Phelps* and *Elisha Hanson,* with whom *Messrs. Bennett C. Clark, J. J. Davidson, Jr., Eberhard P. Deutsch, Ben B. Taylor,* and *John H. Tucker, Jr.,* were on the brief, for appellees.

Mr. Justice Sutherland delivered the opinion of the Court.

This suit was brought by appellees, nine publishers of newspapers in the State of Louisiana, to enjoin the enforcement against them, of the provisions of § 1 of the act of the legislature of Louisiana known as Act No. 23, passed and approved July 12, 1934, as follows:

"That every person, firm, association, or corporation, domestic or foreign, engaged in the business of selling, or making any charge for, advertising or for advertisements, whether printed or published, or to be printed or published, in any newspaper, magazine, periodical or publication whatever having a circulation of more than 20,000 copies per week, or displayed and exhibited, or to be displayed and exhibited by means of moving pictures, in the State of Louisiana, shall, in addition to all other taxes and licenses levied and assessed in this State, pay a license tax for the privilege of engaging in such business in this State of two per cent. (2%) of the gross receipts of such business."

The nine publishers who brought the suit publish thirteen newspapers; and these thirteen publications are the

only ones within the State of Louisiana having each a circulation of more than 20,000 copies per week, although the lower court finds there are four other daily newspapers each having a circulation of "slightly less than 20,000 copies per week" which are in competition with those published by appellees both as to circulation and as to advertising. In addition, there are 120 weekly newspapers published in the state, also in competition, to a greater or less degree, with the newspapers of appellees. The revenue derived from appellees' newspapers comes almost entirely from regular subscribers or purchasers thereof and from payments received for the insertion of advertisements therein.

The act requires everyone subject to the tax to file a sworn report every three months showing the amount and the gross receipts from the business described in § 1. The resulting tax must be paid when the report is filed. Failure to file the report or pay the tax as thus provided constitutes a misdemeanor and subjects the offender to a fine not exceeding $500, or imprisonment not exceeding six months, or both, for each violation. Any corporation violating the act subjects itself to the payment of $500 to be recovered by suit. All of the appellees are corporations. The lower court entered a decree for appellees and granted a permanent injunction. 10 F. Supp. 161.

*First.* Appellant assails the federal jurisdiction of the court below on the ground that the matter in controversy does not exceed the sum or value of $3,000, as required by par. 1 of § 24 of the Judicial Code. The case arises under the Federal Constitution; and the bill alleges, and the record shows, that the requisite amount is involved in respect of each of six of the nine appellees. This is enough to sustain the jurisdiction of the district court. The motion was to dismiss the bill—that is to say, the bill in its entirety—and in that form it was properly denied. No motion to dismiss was made or considered

by the lower court as to the three appellees in respect of whom the jurisdictional amount was insufficient, and that question, therefore, is not before us. *The Rio Grande,* 19 Wall. 178, 189; *Gibson* v. *Shufeldt,* 122 U. S. 27, 32.

*Second.* The objection also is made that the bill does not make a case for equitable relief. But the objection is clearly without merit. As pointed out in *Ohio Oil Co.* v. *Conway,* 279 U. S. 813, 815, the laws of Louisiana afford no remedy whereby restitution of taxes and property exacted may be enforced, even where payment has been made under both protest and compulsion. It is true that the present act contains a provision (§ 5) to the effect that where it is established to the satisfaction of the Supervisor of Public Accounts of the state that any payment has been made under the act which was "not due and collectible," the Supervisor is authorized to refund the amount out of any funds on hand collected by virtue of the act and not remitted to the state treasurer according to law. It seems clear that this refers only to a payment not due and collectible within the terms of the act, and does not authorize a refund on the ground that the act is invalid. Moreover, the act allows the Supervisor to make remittances immediately to the state treasurer of taxes paid under the act, and requires him to do so not later than the 30th day after the last day of the preceding quarter; in which event the right to a refund, if not sooner exercised, would be lost. Whether an aggrieved taxpayer may obtain relief under § 5 is, at best, a matter of speculation. In no view can it properly be said that there exists a plain, adequate and complete remedy at law. *Davis* v. *Wakelee,* 156 U. S. 680, 688; *Union Pacific R. Co.* v. *Weld County,* 247 U. S. 282, 285.

*Third.* The validity of the act is assailed as violating the Federal Constitution in two particulars—(1) that it abridges the freedom of the press in contravention of the due process clause contained in § 1 of the Fourteenth

Amendment; (2) that it denies appellees the equal protection of the laws in contravention of the same Amendment.

1. The first point presents a question of the utmost gravity and importance; for, if well made, it goes to the heart of the natural right of the members of an organized society, united for their common good, to impart and acquire information about their common interests. The First Amendment to the Federal Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . ." While this provision is not a restraint upon the powers of the states, the states are precluded from abridging the freedom of speech or of the press by force of the due process clause of the Fourteenth Amendment.

In the case of *Hurtado* v. *California,* 110 U. S. 516, this Court held that the term "due process of law" does not require presentment or indictment by a grand jury as a prerequisite to prosecution by a state for a criminal offense. And the important point of that conclusion here is that it was deduced from the fact that the Fifth Amendment, which contains the due process of law clause in its national aspect, also required an indictment as a prerequisite to a prosecution for crime under federal law; and it was thought that since no part of the amendment could be regarded as superfluous, the term "due process of law" did not, *ex vi termini,* include presentment or indictment by a grand jury in any case; and that the due process of law clause of the Fourteenth Amendment should be interpreted as having been used in the same sense, and as having no greater extent. But in *Powell* v. *Alabama,* 287 U. S. 45, 65, 68, we held that in the light of subsequent decisions the sweeping language of the *Hurtado* case could not be accepted without qualification. We concluded that certain fundamental rights, safeguarded by the first eight amendments against federal action, were also safe-

guarded against state action by the due process of law clause of the Fourteenth Amendment, and among them the fundamental right of the accused to the aid of counsel in a criminal prosecution.

That freedom of speech and of the press are rights of the same fundamental character, safeguarded by the due process of law clause of the Fourteenth Amendment against abridgement by state legislation, has likewise been settled by a series of decisions of this Court beginning with *Gitlow* v. *New York*, 268 U. S. 652, 666, and ending with *Near* v. *Minnesota*, 283 U. S. 697, 707. The word "liberty" contained in that amendment embraces not only the right of a person to be free from physical restraint, but the right to be free in the enjoyment of all his faculties as well. *Allgeyer* v. *Louisiana*, 165 U. S. 578, 589.

Appellant contends that the Fourteenth Amendment does not apply to corporations; but this is only partly true. A corporation, we have held, is not a "citizen" within the meaning of the privileges and immunities clause. *Paul* v. *Virginia*, 8 Wall. 168. But a corporation is a "person" within the meaning of the equal protection and due process of law clauses, which are the clauses involved here. *Covington & Lexington Turnpike Co.* v. *Sandford*, 164 U. S. 578, 592; *Smyth* v. *Ames*, 169 U. S. 466, 522.

The tax imposed is designated a "license tax for the privilege of engaging in such business"—that is to say, the business of selling, or making any charge for, advertising. As applied to appellees, it is a tax of two per cent. on the gross receipts derived from advertisements carried in their newspapers when, and only when, the newspapers of each enjoy a circulation of more than 20,000 copies per week. It thus operates as a restraint in a double sense. First, its effect is to curtail the amount of revenue realized from advertising, and, second, its direct

tendency is to restrict circulation. This is plain enough when we consider that, if it were increased to a high degree, as it could be if valid (*Magnano Co.* v. *Hamilton*, 292 U. S. 40, 45, and cases cited), it well might result in destroying both advertising and circulation.

A determination of the question whether the tax is valid in respect of the point now under review, requires an examination of the history and circumstances which antedated and attended the adoption of the abridgement clause of the First Amendment, since that clause expresses one of those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions" (*Hebert* v. *Louisiana*, 272 U. S. 312, 316), and, as such, is embodied in the concept "due process of law" (*Twining* v. *New Jersey*, 211 U. S. 78, 99), and, therefore, protected against hostile state invasion by the due process clause of the Fourteenth Amendment. Cf. *Powell* v. *Alabama*, *supra*, pp. 67–68. The history is a long one; but for present purposes it may be greatly abbreviated.

For more than a century prior to the adoption of the amendment—and, indeed, for many years thereafter—history discloses a persistent effort on the part of the British government to prevent or abridge the free expression of any opinion which seemed to criticize or exhibit in an unfavorable light, however truly, the agencies and operations of the government. The struggle between the proponents of measures to that end and those who asserted the right of free expression was continuous and unceasing. As early as 1644, John Milton, in an "Appeal for the Liberty of Unlicensed Printing," assailed an act of Parliament which had just been passed providing for censorship of the press previous to publication. He vigorously defended the right of every man to make public his honest views "without previous censure"; and declared the impossibility of finding any man base enough to ac-

cept the office of censor and at the same time good enough
to be allowed to perform its duties. Collett, History of
the Taxes on Knowledge, vol. I, pp. 4–6. The act expired
by its own terms in 1695. It was never renewed; and the
liberty of the press thus became, as pointed out by Wick-
war (The Struggle for the Freedom of the Press, p. 15),
merely "a right or liberty to publish *without* a license
what formerly could be published only *with* one." But
mere exemption from previous censorship was soon rec-
ognized as too narrow a view of the liberty of the press.

In 1712, in response to a message from Queen Anne
(Hansard's Parliamentary History of England, vol. 6, p.
1063), Parliament imposed a tax upon all newspapers and
upon advertisements. Collett, vol. I, pp. 8–10. That the
main purpose of these taxes was to suppress the publica-
tion of comments and criticisms objectionable to the
Crown does not admit of doubt. Stewart, Lennox and the
Taxes on Knowledge, 15 Scottish Historical Review,
322–327. There followed more than a century of resist-
ance to, and evasion of, the taxes, and of agitation for
their repeal. In the article last referred to (p. 326),
which was written in 1918, it was pointed out that these
taxes constituted one of the factors that aroused the
American colonists to protest against taxation for the pur-
poses of the home government; and that the revolution
really began when, in 1765, that government sent stamps
for newspaper duties to the American colonies.

These duties were quite commonly characterized as
"taxes on knowledge," a phrase used for the purpose of
describing the effect of the exactions and at the same
time condemning them. That the taxes had, and were
intended to have, the effect of curtailing the circulation
of newspapers, and particularly the cheaper ones whose
readers were generally found among the masses of the
people, went almost without question, even on the part of

those who defended the act. May (Constitutional History of England, 7th ed., vol. 2, p. 245), after discussing the control by "previous censure," says: ". . . a new restraint was devised in the form of a stamp duty on newspapers and advertisements,—avowedly for the purpose of repressing libels. This policy, being found effectual in limiting the circulation of cheap papers, was improved upon in the two following reigns, and continued in high esteem until our own time." Collett (vol. I, p. 14), says, "Any man who carried on printing or publishing for a livelihood was actually at the mercy of the Commissioners of Stamps, when they chose to exert their powers."

Citations of similar import might be multiplied many times; but the foregoing is enough to demonstrate beyond peradventure that in the adoption of the English newspaper stamp tax and the tax on advertisements, revenue was of subordinate concern; and that the dominant and controlling aim was to prevent, or curtail the opportunity for, the acquisition of knowledge by the people in respect of their governmental affairs. It is idle to suppose that so many of the best men of England would for a century of time have waged, as they did, stubborn and often precarious warfare against these taxes if a mere matter of taxation had been involved. The aim of the struggle was not to relieve taxpayers from a burden, but to establish and preserve the right of the English people to full information in respect of the doings or misdoings of their government. Upon the correctness of this conclusion the very characterization of the exactions as "taxes on knowledge" sheds a flood of corroborative light. In the ultimate, an informed and enlightened public opinion was the thing at stake; for, as Erskine, in his great speech in defense of Paine, has said, "The liberty of opinion keeps governments themselves in due subjection to their

duties." Erskine's Speeches, High's ed., vol. I, p. 525. See May's Constitutional History of England, 7th ed., vol. 2, pp. 238–245.

In 1785, only four years before Congress had proposed the First Amendment, the Massachusetts legislature, following the English example, imposed a stamp tax on all newspapers and magazines. The following year an advertisement tax was imposed. Both taxes met with such violent opposition that the former was repealed in 1786, and the latter in 1788. Duniway, Freedom of the Press in Massachusetts, pp. 136–137.

The framers of the First Amendment were familiar with the English struggle, which then had continued for nearly eighty years and was destined to go on for another sixty-five years, at the end of which time it culminated in a lasting abandonment of the obnoxious taxes. The framers were likewise familiar with the then recent Massachusetts episode; and while that occurrence did much to bring about the adoption of the amendment (see Pennsylvania and the Federal Constitution, 1888, p. 181), the predominant influence must have come from the English experience. It is impossible to concede that by the words "freedom of the press" the framers of the amendment intended to adopt merely the narrow view then reflected by the law of England that such freedom consisted only in immunity from previous censorship; for this abuse had then permanently disappeared from English practice. It is equally impossible to believe that it was not intended to bring within the reach of these words such modes of restraint as were embodied in the two forms of taxation already described. Such belief must be rejected in the face of the then well known purpose of the exactions and the general adverse sentiment of the colonies in respect of them. Undoubtedly, the range of a constitutional provision phrased in terms of the common law sometimes may be fixed by recourse to the applicable rules of that

law. But the doctrine which justifies such recourse, like other canons of construction, must yield to more compelling reasons whenever they exist. Cf. *Continental Illinois Nat. Bank* v. *Chicago, R. I. & P. Ry. Co.*, 294 U. S. 648, 668–669. And, obviously, it is subject to the qualification that the common law rule invoked shall be one not rejected by our ancestors as unsuited to their civil or political conditions. *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 276–277; *Waring* v. *Clarke*, 5 How. 441, 454–457; *Powell* v. *Alabama, supra,* pp. 60–65.

In the light of all that has now been said, it is evident that the restricted rules of the English law in respect of the freedom of the press in force when the Constitution was adopted were never accepted by the American colonists, and that by the First Amendment it was meant to preclude the national government, and by the Fourteenth Amendment to preclude the states, from adopting any form of previous restraint upon printed publications, or their circulation, including that which had theretofore been effected by these two well-known and odious methods.

This court had occasion in *Near* v. *Minnesota, supra,* at pp. 713 *et seq.,* to discuss at some length the subject in its general aspect. The conclusion there stated is that the object of the constitutional provisions was to prevent previous restraints on publication; and the court was careful not to limit the protection of the right to any particular way of abridging it. Liberty of the press within the meaning of the constitutional provision, it was broadly said (p. 716), meant "principally although not exclusively, immunity from previous restraints or [from] censorship."

Judge Cooley has laid down the test to be applied— "The evils to be prevented were not the censorship of the press merely, but any action of the government by

250

means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." 2 Cooley's Constitutional Limitations, 8th ed., p. 886.

It is not intended by anything we have said to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government. But this is not an ordinary form of tax, but one single in kind, with a long history of hostile misuse against the freedom of the press.

The predominant purpose of the grant of immunity here invoked was to preserve an untrammeled press as a vital source of public information. The newspapers, magazines and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern. The tax here involved is bad not because it takes money from the pockets of the appellees. If that were all, a wholly different question would be presented. It is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties. A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves.

In view of the persistent search for new subjects of taxation, it is not without significance that, with the single exception of the Louisiana statute, so far as we can discover, no state during the one hundred fifty years of our

national existence has undertaken to impose a tax like that now in question.

The form in which the tax is imposed is in itself suspicious. It is not measured or limited by the volume of advertisements. It is measured alone by the extent of the circulation of the publication in which the advertisements are carried, with the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers.

2. Having reached the conclusion that the act imposing the tax in question is unconstitutional under the due process of law clause because it abridges the freedom of the press, we deem it unnecessary to consider the further ground assigned that it also constitutes a denial of the equal protection of the laws.

*Decree affirmed.*