[Criminal No. 904. Filed October 20, 1941.]

[118 Pac. (2d) 97.]

THE STATE OF ARIZONA, Appellee, v. CHARLES JOBIN, Appellant.

Mr. Joe Conway, Attorney General, Mr. Albert M. Garcia, Assistant Attorney General, and Mr. Chas. H. Reed, of Counsel, for Appellee.

Mr. Charlie W. Clark, for Appellant.

LOCKWOOD, C. J.—This is an appeal by Charles Jobin, called defendant, from a judgment pronounced on him, after a verdict by a jury in the superior court of Pinal county finding him guilty of a violation of ordinance number 101, of the city of Casa Grande. The provisions of the ordinance which defendant was found guilty of violating read as follows:

"Section 1. It shall be unlawful for any person . . . to carry on any trade, calling, profession, occupation or business in this ordinance specified, without first having procured a license from the City of Casa Grande, so to do, or complying with any and all regulations of such trade, profession, occupation or business mentioned in this ordinance . . . and each day or fractional part of a day that any trade, business, profession or occupation in this ordinance specified is conducted or carried on without such license shall be a misdemeanor. . . . "

"Section 2. As used in this ordinance the term 'peddler' shall include solicitors and other vendors not having a permanent place of business in the City of Casa Grande. . . . All persons coming within the definition of the occupations defined herein shall pay a quarterly license fee of twenty-five dollars ($25.00) in advance."

It was enacted under the provisions of section 16–207, Arizona Code 1939, which reads so far as material as follows:

"*General powers of common council enumerated.*— The common council of such town shall have control of the finances, and of the property of the corporation; and shall likewise have power within the limits of the town: . . .

"20. To license, tax and regulate . . . peddlers. . . ."

■ The ordinance on its face is the ordinary occupational license tax ordinance for the purpose of raising revenue and is, generally speaking, valid. *City of Glendale* v. *Betty*, 45 Ariz. 327, 43 Pac. (2d) 206. Nor, indeed, does defendant deny this fact. His contention is that if the ordinance is construed to apply to his actions as they appear in the record, it is unconstitutional and void as being in conflict with the First Amendment to the Constitution of the United States, which reads as follows:

"[Religious and political freedom.] Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The facts as shown by the evidence and found by the jury may be stated as follows: Defendant is a regularly ordained minister of the denomination commonly known as Jehovah's Witnesses, and on August 15, 1940, was going from house to house in the city of Casa Grande preaching the gospel, as he understood it, by means of his spoken word, by playing various religious records on a phonograph, with the approval of the householder, and by distributing printed books, pamphlets and tracts which set forth his views as to the meaning of the Bible. The method of distribu-

tion of these printed books, pamphlets and tracts was as follows: He first offered them for sale at various prices ranging from five to twenty-five cents each. If the householder did not desire to purchase any of them he then left a small leaflet summarizing some of the doctrines which he preached. In at least two cases, however, he sold a copy of one of the printed books which he had offered, for twenty-five cents.

Defendant admitted that he was offering these books and pamphlets for sale regularly in the city of Casa Grande and elsewhere, but stated that in some cases, if the parties did not desire to buy the books but promised to read them carefully, they were given free of charge. He also testified that he was doing this because he believed it was his religious duty to do so. He admitted that not only he had not applied for a license to sell the books in question, under the ordinance above set forth, but that when the city marshal told him that he was violating the ordinance, he insisted that he had a right to do so and refused to purchase a license. It is claimed that he could not be compelled to take out a license as preliminary to selling the books and pamphlets in question because (a) it violated his right of free speech, and (b) his free exercise of religion, as guaranteed him by the First Amendment, *supra*.

The first question we consider is whether what he was engaged in doing was peddling, for if it was not he has not violated the ordinance. A peddler has been comprehensively defined as a small retail dealer who carries his merchandise with him, traveling from place to place, or from house to house, exhibiting his or his principal's goods for sale and selling them. *Collender* v. *Reardon*, 138 App. Div. 738, 123 N. Y. Supp. 587; *Ex parte Hogg*, 70 Tex. Cr. R. 161, 156 S. W. 931. Many other definitions have been given

by the cases but they all necessarily include a small retail dealer who carries his merchandise with him and travels from house to house.

██ It is obvious from the record made that defendant was engaged in business as a peddler, for it is not necessary in order to constitute one such that it should be his sole or principal business. *Hays* v. *Commonwealth,* 107 Ky. 655, 55 S. W. 425; *State* v. *Littlefield,* 112 Me. 214, 91 Atl. 945. Nor is it necessary that any considerable number of sales be shown. *Commonwealth* v. *Reid,* 175 Mass. 325, 56 N. E. 617; *State* v. *Webber,* 214 Mo. 272, 113 S. W. 1054, 15 Ann. Cas. 983.

In the present case not only were two actual sales shown, but defendant stated it was part of his regular business to sell these books and pamphlets. If the books which he sold were dictionaries, works of travel, fiction, or the like there could be no question but that he was engaged in peddling, for instead of taking orders and delivering the books later, he carried them with him and delivered them immediately upon sale. The question then is whether the fact that the books sold, which admittedly contained various arguments, and citations supporting the religious belief which he was engaged in promulgating, and which he believed it to be his religious duty to sell, exempts him from the ordinance by reason of the First Amendment to the Federal Constitution, *supra.*

So far as the right of free speech is concerned, we think the question is definitely settled by the decisions of the Supreme Court of the United States in *Grosjean* v. *American Press Co.,* 297 U. S. 233, 56 Sup. Ct. 444, 80 L. Ed. 660, and *Giragi* v. *Moore,* 48 Ariz. 33, 58 Pac. (2d) 1249, 110 A. L. R. 314; Id., 49 Ariz. 74, 64 Pac. (2d) 819, 110 A. L. R. 320; Id., 301 U. S. 670, 57 Sup. Ct. 946, 81 L. Ed. 1334. In the Grosjean case

the Louisiana statute imposing a license tax for the privilege of engaging in the business of publishing advertising in a newspaper was held *under the circumstances of the case* to constitute a violation of the First Amendment, *supra.* The court in discussing the matter said [297 U. S. 233, 56 Sup. Ct. 449, 80 L. Ed. 660]:

" . . . The tax here involved is bad not because it takes money from the pockets of the appellees. If that were all, a wholly different question would be presented. It is bad because, *in the light of its history and of its present setting,* it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties. . . ." (Italics ours.)

 The state of Arizona has adopted a general sales tax law, and in the case of *Giragi* v. *Moore, supra,* it was contended that under the doctrine of the Grosjean case the sales tax law was invalid as applied to newspapers. We pointed out the difference between the facts and background of the Louisiana and the Arizona sales tax as affecting newspapers and that our tax was obviously a general revenue law applied to many other occupations besides newspapers and in no manner an attempt to regulate or limit the publication of a newspaper, and held the law constitutional as not violating the freedom of speech as guaranteed by the Fourteenth Amendment. The case was appealed to the Supreme Court of the United States, and on the authority of the very Grosjean case relied upon by defendant herein the appeal was dismissed as not involving a federal question. We think it is obvious to anyone who will read the cases above cited on this point that the general revenue ordinance of the city of Casa Grande imposing a license on peddlers is not unconstitutional as applied to the defendant because it violates the right of free speech.

But the point most vigorously urged is that it violates the right of the free exercise of religion. Baldly stated, defendant contends that he has the right to peddle and sell for money any books, papers and pamphlets which uphold and inculcate his particular religious belief, without paying the license required of peddlers of all secular books, merely because he believes it to be his religious duty to do so. The particular denomination to which defendant belongs has been before the courts of the various states and the federal government many times in the last few years, because its members believe they have a right, under the claim of free exercise of religion, to do many things which are prohibited by law and to refrain from doing others which are commanded by law, because their conscience does not approve of the law. We have been cited to a number of cases where this denomination was involved. Among those is the case of *Lovell* v. *Griffin*, 303 U. S. 444, 58 Sup. Ct. 666, 82 L. Ed. 949. The ordinance in that case, however, prohibited the distribution of literature of any kind at any time, at any place and in any manner, free or otherwise, without a permit from the city manager, and gave the manager discretion in the issuance of the permit. The court held, and we think very properly so, that the ordinance was void as striking at the freedom of the press and free speech. In the present case the dissimilarity of the two ordinances is obvious. The court instructed the jury as follows:

" . . . The court instructs you as a matter of law that this defendant had a perfect right in the city of Casa Grande or any other place in the State of Arizona to, as long as he did not disturb the peace or trespass, give his views on religious matters. He had a perfect right to distribute free any pamphlets, books or literature without obtaining from the city of Casa Grande a permit or license to distribute them. The

court wants to remind you that in this matter the defendant is accused of having sold these pamphlets, books, etc., without procuring a license or permit so to do. Now if you find from the evidence that he did not sell these books or pamphlets, you should promptly acquit him. On the other hand, if you find he did sell these books and pamphlets without having procured a license so to do, then you should find the defendant guilty.''

and it is obvious therefrom that had defendant, in pursuance of his religious belief, distributed the literature free of charge, the jury, under the instructions of the court, would have acquitted him.

The same question was raised in the case of *Cantwell* v. *Connecticut,* 310 U. S. 296, 60 Sup. Ct. 900, 904, 84 L. Ed. 1213, 128 A. L. R. 1352, and the court held the ordinance unconstitutional as applied to Jehovah's Witnesses, stating:

''It will be noted, however, that the Act requires an application to the secretary of the public welfare council of the State; that he is empowered to determine whether the cause is a religious one, and that the issue of a certificate depends upon his affirmative action. If he finds that the cause is not that of religion, to solicit for it becomes a crime. He is not to issue a certificate as a matter of course. His decision to issue or refuse it involves appraisal of facts, the exercise of judgment, and the formation of an opinion. He is authorized to withhold his approval if he determines that the cause is not a religious one. Such a censorship of religion as the means of determining its right to survive is a denial of liberty protected by the First Amendment and included in the liberty which is within the protection of the Fourteenth.''

As in *Lovell* v. *Griffin, supra,* the ordinance objected to left it to the discretion of a public official as to whether the permit should be granted. The right of free speech, though not of religious liberty, was also involved in the cases of *Schneider* v. *State of New*

*Jersey, Town of Irvington,* 308 U. S. 147, 60 Sup. Ct. 146, 84 L. Ed. 155, and *Hague* v. *Committee for Industrial Organization,* 307 U. S. 496, 59 Sup. Ct. 954, 83 L. Ed. 1423. In these cases the court again held the ordinances in question were void on the ground that the permit to be issued involved the discretion of some public officer, and in *Schneider* v. *State of New Jersey, Town of Irvington, supra* [308 U. S. 147, 60 Sup. Ct. 152, 84 L. Ed. 155], expressly stated:

" . . . The ordinance is not limited to those who canvass for private profit; nor is it merely the common type of ordinance requiring some form of registration or license of hawkers, or peddlers. . . .

"We are not to be taken as holding that commercial soliciting and canvassing may not be subjected to such regulation as the ordinance requires. . . . "

The general question of how far the state may go in adopting rules of conduct which violate the conscience of some individuals is discussed in *Hamilton* v. *University of Cal.,* 293 U. S. 245, 55 Sup. Ct. 197, 206, 79 L. Ed. 343. The question involved there was the right of a conscientious objector to refuse to take military training and still insist upon the privilege of attending the state university. The court held that the defendants in that case could not refuse to take the training and at the same time claim the privileges of education. MR. JUSTICE CARDOZO, in a specially concurring opinion, said:

"The conscientious objector, if his liberties were to be thus extended, might refuse to contribute taxes in furtherance of a war, whether for attack or for defense, or in furtherance of any other end condemned by his conscience as irreligious or immoral. The right of private judgment has never yet been so exalted above the powers and the compulsion of the agencies of government. One who is a martyr to a principle— which may turn out in the end to be a delusion or an

error—does not prove by his martyrdom that he has kept within the law.''

and in this he was joined by MR. JUSTICE STONE and MR. JUSTICE BRANDEIS.

The latest case from the Supreme Court of the United States in regard to religious liberty is *Minersville School Dist.* v. *Gobitis,* 310 U. S. 586, 60 Sup. Ct. 1010, 1012, 84 L. Ed. 1375, 127 A. L. R. 1493. This case involved Jehovah's Witnesses. The local rules of the board of education of the public schools required both teachers and pupils to salute the national flag and pledge allegiance thereto as a daily school exercise. The children of Gobitis refused to do this on the ground that it was contrary to the religious belief which they had been taught by their parents, and the court said:

''We must decide whether the requirement of participation in such a ceremony, exacted from a child who refuses upon sincere religious grounds, infringes without due process of law the liberty guaranteed by the Fourteenth Amendment.''

After discussing the legitimate right of the propagation of belief as held in *Cantwell* v. *Connecticut, supra,* the court continued:

''But the manifold character of man's relations may bring his conception of religious duty into conflict with the secular interests of his fellow-men. When does the constitutional guarantee compel exemption from doing what society thinks necessary for the promotion of some great common end, or from a penalty for conduct which appears dangerous to the general good? To state the problem is to recall the truth that no single principle can answer all of life's complexities. The right to freedom of religious belief, however dissident and however obnoxious to the cherished beliefs of others—even of a majority—is itself the denial of an absolute. But to affirm that the freedom to follow conscience has itself no limits in the life of a society

would deny that very plurality of principles which, as a matter of history, underlies protection of religious toleration. . . .

"The religious liberty which the Constitution protects has never excluded legislation of general scope not directed against doctrinal loyalties of particular sects. Judicial nullification of legislation cannot be justified by attributing to the framers of the Bill of Rights views for which there is no historic warrant. Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities. The necessity for this adjustment has again and again been recognized. In a number of situations the exertion of political authority has been sustained, while basic considerations of religious freedom have been left inviolate. [Citing cases.] In all these cases the general laws in question, upheld in their application to those who refused obedience from religious conviction, were manifestations of specific powers of government deemed by the legislature essential to secure and maintain that orderly, tranquil, and free society without which religious toleration itself is unattainable. . . . "

It is true that MR. JUSTICE STONE dissented, but his dissent was apparently based on the theory that requiring an affirmative act of saluting the flag was a compulsory expression of a belief which did not coincide with the true belief of the individual and, indeed, violated his religious conviction and was not of sufficient importance to justify the exercise of the police power of the state. In the present case, defendant is not required to refrain from expressing his religious convictions either orally or by the means of printed literature. He is not required to affirm his belief in anything which contradicts these convictions.

He is required merely to refrain from *selling* this literature without paying the regular license tax required of all other persons who peddle literature of any nature within the city of Casa Grande. We might well call defendant's attention to the language of the Master regarding the tribute money. Matt. 22:15–21.

Probably the latest and best statement of the general rule to be applied in cases of this kind is found in *City of Manchester* v. *Leiby,* (1 Cir.) 117 Fed. (2d) 661, 666, in the following language:

" . . . The civil authority can never concede the extreme claim that police regulations of general application not directed against any sect or creed—however widely the regulations may be accepted as being reasonable and proper—are constitutionally inapplicable to persons who sincerely believe the observance of them to be 'an insult to Almighty God.' [Citing case.]"

We are told in the Scripture that salvation is free. Rev. 21:6; Rev. 22:17. So long as defendant seeks to inculcate his ideas of the proper pathway of salvation "without money and without price," he will not violate the ordinance in question. If, however, he insists upon the right to commercialize his propaganda, he must comply with the law or pay the penalty, and this in no way violates the state or the federal Constitution guaranteeing the free exercise of religion.

If defendant still feels that he faces a painful conflict between the call of conscience and man made law, he might read the Apologia and Crito and he would find how one of the wisest of mankind, confronted with a similar choice, resolved the difficulty in a way which has stood the test of the moral judgment of mankind for over two thousand years.

The judgment of the superior court of Pinal county is affirmed.

McALISTER and ROSS, JJ., concur.