Argued and submitted March 18, reversed October 28, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SHERRY SUE BOROWSKI,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0307M; A132129 (Control)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

HOLLY CHRISTIANSEN,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0309M; A132130

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARILYN MOOSHIE,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0310M; A132131

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

HOLLY CHRISTIANSEN,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0333M; A132132

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JESSE BROWN,
aka John # 6 Doe,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0337M; A132133

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RYAN NAVICKAS,
aka Ryan Doe,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0339M; A132134

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GEORGE C. SEXTON,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0341M; A132135

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ERIC C. NAVICKAS,
aka Eric C. Nauickas,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0342M; A132136

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

AMBER DAWN BIRMINGHAM,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0364M; A132137

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DOROTHY FISHER-SMITH,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0367M; A132138

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

NICOLE JULIA WEBB,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0426M; A132139

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STACEY DAWN WILLIAMS,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0427M; A132140

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

AMBER DAWN BIRMINGHAM,
*Defendant-Appellant.*

Josephine County Circuit Court
05-0564M; A132141

220 P3d 100

Lauren C. Regan argued the cause for appellants. With her on the brief were Misha J. Dunlap, Civil Liberties Defense Center, and Kenneth Kreuscher.

Janet A. Metcalf, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Rosenblum, Judge.

SCHUMAN, J.

## SCHUMAN, J.

Defendants were arrested for "[i]nterfer[ing] with agricultural operations," a Class A misdemeanor. ORS 164.887 (set out below). At trial, each defendant filed a motion to dismiss on the grounds that the statute on its face violated the free speech, free assembly, and equality guarantees of the Oregon and United States constitutions. When the trial court denied their motions, defendants entered conditional pleas of no contest, reserving the right to withdraw the pleas in the event of a successful appeal.[1] The court entered judgments of conviction. Defendants appeal. We conclude that the statute does not violate any provision of the Oregon Constitution, but that it does violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

■ Defendants' only challenge to ORS 164.887 is facial. Thus, facts involving the circumstances of defendants' arrests are immaterial; the only relevant "fact" in this case is that defendants were convicted of violating that statute, and the only issue is whether the legislature transgressed one of the specified state or federal constitutional provisions by enacting it. *City of Eugene v. Lincoln*, 183 Or App 36, 41, 50 P3d 1253 (2002). That is a purely legal question that we review for legal error.

ORS 164.887 provides:

"(1) Except as provided in subsection (3) of this section, a person commits the offense of interference with agricultural operations if the person, while on the property of another person who is engaged in agricultural operations, intentionally or knowingly obstructs, impairs or hinders or attempts to obstruct, impair or hinder agricultural operations.

---

[1] ORS 135.335(3) provides:

"With the consent of the court and the state, a defendant may enter a conditional plea of guilty or no contest reserving, in writing, the right, on appeal from the judgment, to a review of an adverse determination of any specified pretrial motion. A defendant who finally prevails on appeal may withdraw the plea."

Defendants were also charged with disorderly conduct and obstructing governmental administration. Those charges were dismissed.

"(2) Interference with agricultural operations is a Class A misdemeanor.

"(3) The provisions of subsection (1) of this section do not apply to:

"(a) A person who is involved in a labor dispute as defined in ORS 662.010 with the other person; or

"(b) A public employee who is performing official duties.

"(4) As used in this section:

"(a)(A) 'Agricultural operations' means the conduct of logging and forest management, mining, farming or ranching of livestock animals or domestic farm animals;

"(B) 'Domestic farm animal' means an animal used to control or protect livestock animals or used in other related agricultural activities; and

"(C) 'Livestock animals' has the meaning given that term in ORS 164.055.

"(b) 'Domestic farm animal' and 'livestock animals' do not include stray animals."

A "labor dispute as defined in ORS 662.010" is

"any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

ORS 662.010(1).

■ We begin with defendants' state constitutional challenges. *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983). Defendants argue, first and second, that ORS 164.887 violates Article I, sections 8 and 26, of the Oregon Constitution. Article I, section 8, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

Article I, section 26, provides, in part:

> "No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good[.]"

According to defendants, ORS 164.887 prohibits conduct that, in some circumstances, might be constitutionally protected expression or assembly. Because they moved to dismiss the charges based on the language of the statute itself and not on its application to their own activity, their argument is that the statute is facially overbroad. They rely principally on *State v. Ausmus*, 336 Or 493, 85 P3d 864 (2003). In that case, the court sustained a facial overbreadth challenge, *id.* at 498-99, based on Article I, sections 8 and 26, to ORS 166.025(1)(e) (2003), *amended by* Or Laws 2005, chapter 631, section 1, which provides:

> "A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person * * * [c]ongregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse[.]"

Because the challenge was facial, the defendants demurred to the indictment and the circumstances of their arrests were not in evidence. Nonetheless, the court reasoned that the statute *hypothetically* could be applied against

> "an individual who, in response to an order to disperse, abandons whatever activity in which they [*sic*] were engaged that made the order lawful in the first place, but continues peaceably to congregate with others, with the intent to cause public inconvenience, annoyance, or alarm or recklessly creates the risk of causing public inconvenience, annoyance or alarm. And, because ORS 166.025(1)(e) reaches that conduct, the legislature has stepped beyond the permissible regulation of damaging conduct or the harmful effects that may result from assembly or speech."

*Ausmus*, 336 Or at 507. The court concluded that, "on its face, ORS 166.025(1)(e) [(2003)] is unconstitutionally overbroad because it restrains conduct that Article I, sections 8 and 26, of the Oregon Constitution protects." *Id.* at 508.

Defendants contend that, like the statute struck down in *Ausmus*, the statute that they challenge here could also hypothetically be applied so as to restrain constitutionally protected conduct.

■ Defendants' argument, however, depends on the proposition that a facial challenge to a statute that regulates only conduct is cognizable under Article I, sections 8 and 26— a proposition that seemingly follows from *Ausmus*, where the court sustained a facial challenge under Article I, section 8, to a statute that did not mention expression, and from *State v. Hirsch/Friend*, 338 Or 622, 114 P3d 1104 (2005), where the court adjudicated (but rejected) a facial challenge under Article I, section 26, to a statute that did not mention assembly. What defendants fail to recognize, however, is that their predicate proposition was emphatically rejected in *State v. Illig-Renn*, 341 Or 228, 142 P3d 62 (2006). In that case, the court held that statutes could *not* be facially challenged under either Article I, section 8, or Article I, section 26, if the statutes did not *expressly* restrain expression or assembly. A statute written in terms to restrain only conduct, without mentioning expression or assembly, is immune from facial challenge even if the statute restrains conduct that is primarily expressive; even if "words accompany [the] conduct"; and even if "the very reason for [the] conduct is expressive." *Illig-Renn*, 341 Or at 237. Such statutes can be challenged only as applied. *Id.* at 234, 236-37. ORS 164.887 expressly restrains only conduct: obstructing, impairing, or hindering specified agricultural operations (or attempting to do so). It does not expressly prohibit speaking, writing, printing, or assembling, although those activities may accompany the prohibited conduct. Defendants' facial challenges under Article I, sections 8 and 26, therefore fail.

■ Their challenge under Article I, section 20, is more complex. That section provides:

> "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

Although section 20 is textually and historically a leveling provision aimed at prohibiting laws that confer special benefits on an aristocratic or quasi-aristocratic "class," it has for

many years served as the state constitutional analog to the federal Equal Protection Clause, prohibiting legislation that imposes burdens on a historically oppressed minority. *See, e.g., Tanner v. OHSU*, 157 Or App 502, 971 P2d 435 (1998) (Article I, section 20, prohibits discrimination based on sexual orientation). In the present case, defendants invoke the provision as it was originally understood. They argue that the statute "grant[s]" an "immunity[y]" (from prosecution) to one "class of citizens" (those who are involved in a labor dispute, broadly defined), but that the immunity does "not equally belong to all citizens."

■ The Oregon courts have developed a framework for analyzing claims under Article I, section 20, in its capacity as a state analog to the Equal Protection Clause, but, in some respects, that framework is inapplicable to claims of allegedly unlawful special privilege. For example, to determine whether a statute unlawfully discriminates against members of a minority class, we first determine whether the burdened group can correctly be called a true "class," that is, a group that consists of individuals who would be considered as belonging to a distinctive group even if the statute that burdens them did not exist (for example, African-Americans, Catholics, veterans, residents of Portland). If the group does not fit that definition, then Article I, section 20, simply does not apply. *Sealey v. Hicks*, 309 Or 387, 397, 788 P2d 435, *cert den*, 498 US 819 (1990). If the statute burdens a "true" class, then we determine whether that class is one that has been "the subject of adverse social or political stereotyping or prejudice." *Tanner*, 157 Or App at 521, 523. If both of those criteria are met, then the challenge will succeed except in the rare situation where the differential treatment "can be justified by genuine differences" as opposed to invidious reliance on stereotyping or prejudice. *Id*. at 523. Obviously, a group that benefits from special privileges or immunities will rarely be a group that has been historically oppressed. Thus, in some cases challenging special privileges or immunities, a different analysis is necessary.

■ It is not necessary here. In *MacPherson v. DAS*, 340 Or 117, 130 P3d 308 (2006), the plaintiffs challenged ORS 197.352 (2005), generally known as Measure 37. One of their contentions was that the statute violated Article I, section 20,

because it conferred a benefit (either immunity from regulation or the privilege of cash compensation) on some property owners—those who had obtained their property before certain land use regulations were enacted—and not others. *Id.* at 129. The court rejected the claim on the ground that those who had obtained property before enactment of regulations did not comprise a class for purposes of Article I, section 20, because these "preowners" did not exist as a group apart from Measure 37 itself. The court explained:

> "Some litigants seeking the protection of Article I, section 20, claim—as do plaintiffs here—that a particular 'class,' of which they are not a member, unlawfully has been accorded a special privilege or status. Other litigants claim that they are members of a 'class' suffering disparate treatment without legitimate reason. In either situation, this court consistently has held that the protection that Article I, section 20, affords is available to only those individuals or groups whom the law classifies according to characteristics that exist apart from the enactment that they challenge."

*Id.* Thus, even when the claim put forward by a statute's challengers alleges that the statute confers a privilege on a special few, the claim is not cognizable under Article I, section 20, when the favored group would not be considered a cohesive and societally recognized group were it not for the challenged statute itself.

That is the situation in this case. If ORS 164.887 immunized trade union members, we might conclude that it privileges a true class, but that is not what the statute does. Rather, it immunizes any person who is "involved in"

> "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

ORS 164.887(3)(a); ORS 662.010. The exception, then, expressly encompasses union members and nonunion members, employees, employees' supporters, and, for example, their attorneys, as well as promanagement demonstrators. It also could encompass any person involved in a personal

injury or workers' compensation claim based on an allegedly unsafe working environment, because such individuals are "involved in" a "controversy" concerning "conditions of employment." To the extent that this collection of individuals forms a group, it is a group that is created by ORS 164.887 itself; without that statute, there are no circumstances under which (for example) a striking union member, the attorney representing the employer, the employer's CEO, and an expert retained by an injured worker would be considered part of a preexisting, socially recognized group. To the extent that they are a group at all, the only trait that they share is the one that is given class-defining significance by the disputed statute itself: involvement in a labor dispute. The statute, therefore, simply does not implicate Article I, section 20.[2]

■ Having determined that the state's law does not deprive defendants of any rights guaranteed by the state constitution, we turn to their argument that the state's law (including its constitutional law) nonetheless falls short of the federal constitutional guarantees of equal protection,[3] free speech, and free assembly.[4]

■ As it happens, this case occupies the small plot of federal constitutional territory where analysis under the Equal Protection Clause is colored by First Amendment considerations. The territory was first mapped in *Police Department of Chicago v. Mosley*, 408 US 92, 92 S Ct 2286, 33 L Ed 2d 212 (1972). In that case, the Supreme Court confronted a constitutional challenge to a Chicago ordinance that, like ORS 164.887, prohibited potentially expressive conduct except when it involved a labor dispute. The ordinance provided:

---

[2] The statute also immunizes public employees who are performing official duties. ORS 164.887(3)(b). Defendants do not argue that the statute violates Article I, section 20, on that basis, and we do not address that issue.

[3] The Equal Protection Clause of the Fourteenth Amendment provides, in part, "No state shall * * * deny to any person within its jurisdiction the equal protection of the laws." US Const, Amend XIV, cl 1.

[4] The First Amendment provides, in part, "Congress shall make no law * * * abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble[.]" The First Amendment applies against the states through incorporation into the Fourteenth Amendment. *Grosjean v. American Press Co.*, 297 US 233, 243, 56 S Ct 444, 80 L Ed 660 (1936).

" 'A person commits disorderly conduct when he knowingly:

" '* * * * *

" '(i) Pickets or demonstrates on a public way within 150 feet of any primary or secondary school building while the school is in session and one-half hour before the school is in session and one-half hour after the school session has been concluded, provided, that this subsection does not prohibit the peaceful picketing of any school involved in a labor dispute * * *.' Municipal Code, c. 193-1 (i)."

*Id.* at 92-93. The Seventh Circuit had held that the ordinance violated the First Amendment because it was overbroad. *Mosley v. Police Department of City of Chicago*, 432 F2d 1256 (7th Cir 1970). The Supreme Court affirmed on different grounds:

"Because Chicago treats some picketing differently from others, we analyze this ordinance in terms of the Equal Protection Clause of the Fourteenth Amendment. Of course, the equal protection claim in this case is closely intertwined with First Amendment interests; the Chicago ordinance affects picketing, which is expressive conduct; moreover, it does so by classifications formulated in terms of the subject of the picketing. As in all equal protection cases, however, the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment."

*Police Department of Chicago*, 408 US at 94-95 (footnote omitted). The Court noted, "The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Id.* at 101. Preventing school disruption, the Court acknowledged, was a "legitimate concern," but the "differential treatment" of labor picketing did not further that objective. *Id.* at 95, 100. To justify differential treatment, in other words, the city would have needed to establish that labor picketing was "clearly more disruptive"; in the absence of that showing, the distinction between labor and nonlabor picketing bore no rational relationship to the stated objective. *Id.* at 100.

Eight years after *Police Department of Chicago*, the Court reaffirmed that case's core holding in another context.

In *Carey v. Brown*, 447 US 455, 100 S Ct 2286, 65 L Ed 2d 263 (1980), the enactment at issue was an Illinois statute that prohibited picketing "before or about the residence of dwelling of any person," but did "not prohibit the peaceful picketing of a place of employment involved in a labor dispute." *Id.* at 457 (internal quotation marks omitted). The state maintained that the statute was a legitimate means of protecting residential privacy and of recognizing the traditional deference to, and exceptional social utility of, labor protests. The Court emphatically rejected both arguments, based on the same reasoning that underlay *Police Department of Chicago*:

> "[T]he exclusion for labor picketing cannot be upheld as a means of protecting residential privacy for the simple reason that nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy. * * *
>
> "* * * * *
>
> "The central difficulty with the [special status of labor protests] argument is that it forthrightly presupposes that labor picketing is more deserving of First Amendment protection than are public protests over other issues, particularly the important economic, social, and political subjects about which these appellees wish to demonstrate. We reject that proposition."

*Id.* at 465-66.

The unambiguous import of these cases is that a statute that imposes criminal penalties on persons who engage in picketing, but creates an exception for persons who are involved in a labor protest, violates the Equal Protection Clause because the statute creates a distinction that has no bearing on any legitimate governmental interest. That conclusion appears fatal to ORS 164.887.

The state, however, contends that there is a dispositive difference between the unconstitutional enactments in *Police Department of Chicago* and *Carey*, on the one hand, and ORS 164.887, on the other: The Oregon statute, the state argues, is directed at conduct, while the unconstitutional enactments in *Police Department of Chicago* and *Carey* are directed at picketing, which is *per se* expressive. For two reasons, we are persuaded that this distinction is not significant.

First, we can perceive no reason why a statute that privileges labor-related conduct *including* expressive labor-related conduct should be treated any differently, for purposes of equal protection analysis, from a statute that privileges labor-related conduct that is expressive *per se*. The former *contains* an unlawful discrimination; the latter *is* an unlawful discrimination. Both are discriminatory, and, in both, the discrimination is based on the beliefs, opinions, or motives of the actor. It is perhaps for that reason that *Police Department of Chicago* itself announces, "The Equal Protection Clause requires that statutes *affecting* First Amendment interests be narrowly tailored to their legitimate objectives." 408 US at 101 (emphasis added).[5]

Second, we take issue with the state's assertion that ORS 164.887 is directed at conduct. If the statute did not have the labor exception in paragraph (3)(a), the state's point might have some force. However, under the statute as written, the characteristic that immunizes otherwise unlawful conduct is that the unlawful conduct is engaged in by a person who is involved in a "controversy concerning terms or conditions of employment." ORS 662.010(1). The only way that such involvement can be determined is by some form of expression—a picket, a leaflet, a button, an assertion, or the response to an inquiry. Put another way, the statute creates a distinction between labor-related obstructions, hindrances, or impairments and nonlabor-related obstructions, hindrances, or impairments. Only the latter is within the ambit of the statute's prohibition. Enforcement of the statute therefore presupposes some form of expression manifesting either involvement or noninvolvement in a controversy about terms or conditions of employment. The statute

---

[5] Defendants also argue that, even if this degree of heightened scrutiny—legitimate governmental objective, narrow tailoring—does not apply to statutes like ORS 164.887 that are written in terms of conduct but nonetheless affect speech, the statute still fails, even under the more deferential analysis that requires only some degree of logical connection between the statute's distinction and a legitimate objective. In the terms that the Court used in *Carey*, they argue that the labor exclusion "cannot be upheld" as a means of achieving the state's objective (presumably the prevention of disruptions of agricultural activities) "for the simple reason that nothing in the content-based labor-nonlabor distinction has any bearing whatsoever" on that objective. 447 US at 465. We need not and do not reach this argument.

therefore discriminates based, necessarily, on the expression of a belief, opinion, affiliation, or motive.

■■ We therefore conclude that, because it contains the impermissible labor-nonlabor distinction, ORS 164.887 violates the Equal Protection Clause. That conclusion, however, does not end our inquiry. We will not declare an entire statute unconstitutional based on the unconstitutionality of one of the statute's parts; rather, the preferred remedy is to sever the unconstitutional provision and salvage the remainder. The legislature has codified that preference in ORS 174.040:

"It shall be considered that it is the legislative intent, in the enactment of any statute, that if any part of the statute is held unconstitutional, the remaining parts shall remain in force unless:

"(1) The statute provides otherwise;

"(2) The remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part; or

"(3) The remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent."

We must therefore determine whether this statutory presumption of severability applies in the present case.

We conclude that it does not. ORS 174.040, by its terms, applies to statutes that contain an "unconstitutional part" and "remaining parts." When a statute offends principles of equal protection because one part creates an entitlement (or burden) and another part withholds that entitlement (or burden) from some people, the statute does not necessarily contain an "unconstitutional part." It is more accurate to say that the constitutional infirmity lies in the rationale underlying the distinction embodied in the conjunction of the exemption created in paragraph (3)(a) with the prohibition embodied in the remaining parts. The issue is not exactly whether an unconstitutional part can be severed. It is, more precisely, whether the legislature would prefer to *eliminate* the exemption, so that all those who interfere with

agricultural operations commit the crime, or, alternatively, would prefer to *extend* the exemption to everybody, in which case the appropriate remedy would be to do away with the statute entirely.

*Salem College & Academy, Inc. v. Emp. Div.*, 298 Or 471, 695 P2d 25 (1985), is instructive in resolving this issue. In that case, the Oregon Supreme Court concluded that extending an exemption from paying employment tax to some religious schools but not others violated the constitutional mandate to treat all religions equally. *Id.* at 490. The court thus had the option of making the exemption universal or eliminating it entirely. It decided to eliminate the exemption:

> "If [the federal unemployment statute] validly requires coverage of independent religious schools, a holding that excludes them from coverage under [Oregon law] would have consequences directly contrary to the legislature's dominant objective of maintaining Oregon's conformity with [federal law]. In a choice between exempting independent religious schools and losing conformity with [federal law] or maintaining that conformity and extending coverage to all religious schools, the legislature in 1977 surely would have chosen the latter course."

*Id.* at 494. Thus, the decision whether to extend the exemption or eliminate it rested on a determination of which option the legislature that enacted the statute would have preferred.

That determination in this case leads us to conclude that ORS 164.887 must be declared unconstitutional *in toto.* We reach that conclusion based, first, on legislative history. ORS 164.887 began in the 1999 legislative session as Senate Bill (SB) 678. As introduced, it did not contain a labor exemption, and it created a Class C felony. In that form, it moved out of the Agriculture and Natural Resources Committee with a "do pass" recommendation after several witnesses testified orally and in writing that the bill would address vandalism, harassment, monkeywrench operations, property destruction, and environmental sabotage. Minutes, Senate Committee on Agriculture and Natural Resources, SB 678, Mar 18 and Apr 21, 1999. The bill was then referred to the

Senate Judiciary Committee, which held a public hearing on May 5. Supporters provided the same sort of testimony that had been presented before the Agriculture and Natural Resources Committee. Minutes, Senate Committee on Judiciary, SB 678, May 5, 1999.

However, testimony against the bill occurred as well. A representative from a farmworkers' organization, Pineros y Campesinos Unidos del Noroeste, testified against the bill, pointing out that it would make much of the activity associated with farm labor disputes against the law. He called the committee's attention to a 1990 case, *Pineros Y Campesinos Unidos v. Goldschmidt*, 790 F Supp 216 (D Or 1990), in which the federal district court had struck down, on First Amendment and equal protection grounds, a statute that prohibited farmworkers from picketing. Tape Recording, Senate Committee on Judiciary, SB 678, May 5, 1999, Tape 166, Side A (statement of Larry Kleinman). Senator Bryant, the committee chair, reassured the witness that, if the bill were to pass, the legislature would adopt a provision expressly exempting persons who were participants in labor disputes. *Id.* (statement of Sen Neil Bryant). Other witnesses, including a representative of the Oregon AFL-CIO, testified that they believed the bill to be "too broad" and that it was unnecessary in light of existing laws against disorderly conduct, criminal trespass, and criminal mischief. *Id.* (statement of Arthur Kunis).

Between the May 5 Judiciary Committee public hearing and a May 26 Judiciary Committee work session, a work group consisting of representatives from ranching and timber groups, the ACLU, and key legislators convened and produced two suggested amendments. One reduced a violation of the statute from a Class C felony to a Class A misdemeanor. Exhibit W, Senate Committee on Judiciary, SB 678, May 26, 1999. The other added what is now paragraph (3)(a), the labor exemption. Exhibit V, Senate Committee on Judiciary, SB 678, May 26, 1999. With those amendments, the bill moved out of committee with a "do pass" recommendation. Minutes, Senate Committee on Judiciary, SB 678, May 26, 1999, 10. Ultimately, and without further amendments of significance, the bill passed both houses and was signed by the governor. Or Laws 1999, ch 694, § 1.

From this legislative history, we can fairly infer that the labor exemption was a critical component of the bill and that the legislature—or at least key players in the legislative process—was concerned about constitutional violations and took measures to craft a statute that avoided them.

That inference is reinforced by the assumption that the legislature prefers to avoid enacting a bill that raises serious questions of constitutionality. *Easton v. Hurita*, 290 Or 689, 702, 625 P2d 1290 (1981); *State v. Pruett*, 37 Or App 183, 185, 586 P2d 800 (1978). Under that presumption, we can infer that, had the legislature known that a bill criminalizing all obstructions, impairments, and hindrances of agricultural operations *also* implicated serious constitutional questions, it would have chosen to avoid the issue entirely—particularly in light of the fact that the conduct at which the statute was primarily directed (vandalism, property destruction, etc.) was already prohibited by existing statutes.

And, in fact, ORS 164.887 without the exemption does raise serious constitutional questions. It applies to conduct that occurs "on the property of another person who is engaged in agricultural operations." ORS 164.887(1). There is no exception for conduct by people who are guests or invitees on that property. A "person" is defined for purposes of most criminal law as including a governmental entity. ORS 161.015(5). "Agricultural operations" include "forest management." ORS 164.887(4)(a)(A). Thus, the statute could criminalize a person for conduct that occurs on forestlands that are managed by the state and federal governments. Conduct constituting the offense includes not only obstructing, impairing, or hindering forest management, but also attempting to do so. ORS 164.887(1). One definition of "obstruct" is "to be or come in the way of," with the illustrative examples, "unwise rules [*obstruct*] legislation" and "constant interruptions [*obstruct*] our progress." *Webster's Third New Int'l Dictionary* 1559 (unabridged ed 2002). "Hinder" is listed as a synonym. *Id.* Thus, a person peacefully picketing against labor or logging practices on public or private land could, under these definitions, be attempting to obstruct an agricultural practice by another person on that person's property by attempting to convince the person, the person's employees, or the general

public to alter the offensive practice. An attorney for an environmental group who seeks to enjoin a company's forest practice, or who represents employees who object to an allegedly unsafe practice, and who goes to company headquarters to participate in a deposition regarding that action, could likewise be guilty of attempting to obstruct an agricultural practice—even if the attorney is *invited* to the headquarters. Other examples are limited only by a creative litigant's imagination.

 Because defendants in this case bring only a facial challenge, we do not have the occasion to decide whether such hypothetical situations fall within the ambit of the statute's prohibition, or whether criminalizing them is unconstitutional, but that is not the point; the point is that the statute clearly raises serious constitutional concerns.[6] That fact, in combination with the fact that almost all of the constitutional applications of ORS 164.887 are already crimes, persuades us that, when presented with the choice between enacting a potentially unconstitutional and almost entirely redundant statute, on the one hand, and, on the other, not enacting anything, the legislature would have opted to do nothing.

In sum, we conclude that ORS 164.887 does not, on its face, violate any provision of the Oregon Constitution, but that it does violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. We also conclude that the appropriate relief is not to excise the labor exemption, because, if presented with the option of taking that action or not enacting the statute at all, the legislature would have chosen the latter. We therefore hold that ORS 164.887 is unconstitutional.

Reversed.

---

[6] Under the First Amendment, in order for a facial challenge to a statute to succeed, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 US 601, 615, 93 S Ct 2908, 37 L Ed 2d 830 (1973). Because we decide this case on equal protection grounds, we need not and do not decide whether the statute also violates the First Amendment.