Argued and submitted January 13, 2010, affirmed May 25, 2011

CLEAR CHANNEL OUTDOOR, INC.,
a Delaware corporation,
formerly known as Ackerly Media Group, Inc.,
a Washington corporation,
dba Clear Channel Outdoor,
*Plaintiff-Appellant,*

*v.*

CITY OF PORTLAND,
*Defendant-Respondent,*

*and*

Joseph COTTER,
*Intervenor-Respondent.*

Multnomah County Circuit Court
980100125; A135896

262 P3d 782

Michael T. Garone argued the cause for appellant. With him on the opening brief was Schwabe, Williamson & Wyatt, P.C. With him on the combined reply and answering brief were Donald Joe Willis, Jill Gelineau, and Schwabe, Williamson & Wyatt, P.C.

Tracy Poole Reeve, Senior Deputy City Attorney, argued the cause and filed the briefs for respondent.

Joseph Cotter filed the brief *pro se*.

Before Sercombe, Presiding Judge, and Wollheim, Judge, and Riggs, Senior Judge.

SERCOMBE, P. J.

**SERCOMBE, P. J.**

This case concerns the remedies available to plaintiff, a sign company that sells advertising space on billboards, after plaintiff obtained a declaration from the court that portions of the City of Portland's sign code were unconstitutional under Article I, section 8, of the Oregon Constitution. When the city did not issue a number of sign permits sought by plaintiff, plaintiff filed suit requesting, among other things, an injunction ordering that the city issue the permits. After an initial ruling by the trial court that portions of the code were facially unconstitutional, the city adopted curative amendments to excise the declared illegality. Because of the curative code amendments as well as the nature of the constitutional deficiency in the sign code, the trial court subsequently refused to grant plaintiff's requested injunction. The court also refused to award damages and attorney fees to plaintiff.

On appeal, plaintiff contends that, in light of unconstitutional provisions in the initial and the amended sign codes, the entire code was unenforceable. Therefore, according to plaintiff, it was entitled to injunctive relief directing the city to issue its permits. Plaintiff argues further that it suffered damages because of the application of a sign code that violated the federal constitution and that the court erred in refusing to award damages and attorney fees. The city responds that the unconstitutional provisions did not result in the denial of plaintiff's permits and did not damage plaintiff. For the reasons explained below, we affirm.

## I.  HISTORICAL FACTUAL BACKGROUND

The disputed sign code provisions relate to the city's past attempts to regulate billboards and painted wall signs—as opposed to painted wall murals. Other questioned provisions limited the size of signs and contained adjustment criteria—that is, the standards for adjusting the requirements of the sign code.

Plaintiff provides advertising on outdoor signs in the City of Portland and throughout Oregon. Plaintiff and its predecessors have filed a number of lawsuits over the years challenging the constitutionality of the city's regulation of

billboards. As a result of that litigation, plaintiff and the city stipulated to a judgment in June 1986, which allowed for a specific number of billboards and substituted a particular permit approval process for the process otherwise required under the sign code. The stipulated judgment expired in September 1996.

Prior to the expiration of the stipulated judgment, the city amended its sign code in two ways that particularly affected the display of large signs and that are the subject of the dispute in this case. Prior to 1991, the city defined "sign," the objects regulated by its sign code, as

> "[m]aterials placed or constructed primarily to convey a message or other display and which can be viewed from a right-of-way, private roadway or another property."

*Former* Portland City Code (PCC) 33.12.710(Y) (1986).[1] That code defined a "painted wall sign" as "[a] sign applied to a building wall with paint and which has no sign structure." *Former* PCC 33.12.710(Q) (1986). However, the city exempted "[p]ainted wall decorations and painted wall highlights" from the provisions of the code that regulated signs, *former* PCC 33.535.100(G) (1986), and defined "painted wall decorations" as "displays painted directly on a wall and * * * designed and intended as a decorative or ornamental feature," *former* PCC 33.12.710(O) (1986).

In 1991, in an effort to clarify the status of painted wall murals as "painted wall decorations" and thus exempt them from regulation under the code, the city amended the definitions of "painted wall decorations" and "sign" by adding the following italicized text:

> "Painted wall decorations. Displays painted directly on a wall which are designed and intended as a decorative or ornamental feature. *Painted wall decorations do not contain text, numbers, registered trademarks, or registered logos.*
>
> "* * * * *

---

[1] The provisions of the city's sign code have been renumbered and amended over the past several decades; currently, the sign code is codified as Title 32 of the Portland City Code.

"Sign. Materials placed or constructed primarily to convey a message and which can be viewed from a right-of-way or another property. *Signs contain text, numbers, registered trademarks, or registered logos.*"

*Former* PCC 33.910.030 (1991) (Sign-Related Definitions). The trial court found that the primary purpose of that amendment was "to encourage 'art' " and "restrict[ ] commercial speech, particularly to allow and encourage such wholesome activities as children painting wall murals; the City's secondary interests were administrative practicality and avoiding another loss in court." (Footnote omitted.)

The second change occurred in September 1996, immediately prior to the expiration of the stipulated judgment later that month. That sign code amendment reduced the maximum allowed size of signs to 200 square feet. The amendment precluded the two standard billboard display configurations in Portland—that is, (1) a 288 square foot "poster" with dimensions of 12 feet by 24 feet and (2) a 672 square foot "bulletin" with dimensions of 14 feet by 48 feet. The 1996 sign code also retained a 25-feet height restriction for signs; plaintiff's billboards were commonly 50 feet in height.

The trial court concluded that the effects of those changes made plaintiff's existing billboards nonconforming uses, not subject to future replacement, and precluded new billboard sign permits:

"Although it is clear that by some time in the future, the City's sign code and related ordinances would require plaintiff to remove all nonconforming signs absent some change in the law or other intervention, it is not at all clear from this record how quickly plaintiff would in fact lose how many of its 566 existing billboards. All that the record shows is that nonconforming uses are legal, that when the existing use ceases or is so modified to be subject to new regulation, the nonconforming use must cease, that there are some occasions that permit relocation when the use is lost by government action, and that the regulations governing nonconforming uses are 'complicated.' "

(Footnote and citation omitted.)

In late 1997, concerned about the constitutionality of the sign/painted wall decoration distinction in its sign code, the city began to reconsider whether to regulate painted wall decorations (murals) in the same manner as it regulated painted wall signs. On December 17, 1997, the city adopted a moratorium on any new painted wall sign or wall decoration within the central portion of the city, temporarily abandoning any regulatory distinction between painted wall signs and wall decorations. City of Portland Ordinance No. 171881. That moratorium was extended to the rest of the city in August 1998. City of Portland Ordinance No. 172599.

Plaintiff filed nine applications for 11 painted wall signs in the central city district on December 16, 1997, immediately prior to the adoption of the moratorium. It sought two permits for wall signs outside the central city district on January 14, 1998, prior to the expansion of the moratorium. The city denied those sign permit applications because the signs exceeded the code's size limitation of 200 square feet.

On July 2, 1998, plaintiff filed building permit and land use applications for 83 new billboards. All of the requested signs exceeded the 200 square foot size limitation. The city denied 29 of the requested permits because the proposed billboards were located in areas where signs were not allowed. Plaintiff's requests for variances of the size limitation for the remaining applications were denied under the city's sign adjustment criteria, as were the supplementary requests for design review for eight of the applications.

## II.  PROCEDURAL HISTORY

Plaintiff's petition for review and second amended complaint, which was filed on August 6, 1998, framed the claims that were ultimately decided by the trial court. The petition sought a writ of review of the adoption of the 1997 moratorium ordinance that applied to the central portion of the city, claiming various procedural errors in its adoption and substantive concerns with its constitutionality under the state and federal constitutions. The first claim for relief in the amended complaint sought a declaration that the moratorium ordinance was unconstitutional and void. The remaining claims for relief sought declaratory and injunctive relief, together with damages under 42 USC section 1983,

because of the purportedly unconstitutional portions of the sign code. In its second claim for relief, plaintiff requested a declaration that the distinction in the sign code between "sign," "painted wall sign," and "painted wall decoration," as well as the city's sign regulations (including the sign adjustment criteria) and the "city's design review regulations * * * and the city's design guidelines," violated the First and Fourteenth Amendments to the United States Constitution and Article I, sections 8 and 20, of the Oregon Constitution, as "content-based, overbroad, vague, and discriminatory."[2] The third claim for relief sought an injunction mandating the issuance of the 83 building permits and associated land use permits for new billboard signs. The fourth claim sought damages under section 1983 because of the city's actions and attorney fees under 42 USC section 1988.[3]

Plaintiff quickly obtained partial relief on its second and third claims. On November 17, 1998, after plaintiff had filed its motion for partial summary judgment, the trial court entered a "partial final judgment" on plaintiff's second and third claims for relief that

> "the definitions of 'sign,' 'painted wall decorations,' and 'painted wall signs,' in Portland City Code 33.910.030 on their face violate Article I, section 8, of the Oregon

---

[2] Article I, section 8, provides, in part, that "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever[.]" Analogously, the First Amendment provides, in part, that "Congress shall make no law * * * abridging the freedom of speech, or of the press[.]" Article I, section 20, by comparison, provides that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens[,]" and the Equal Protection Clause of the Fourteenth Amendment provides that "nor shall any State * * * deny to any person within its jurisdiction the equal protection of the laws."

[3] 42 USC section 1983 provides, in part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State * * * subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

42 USC section 1988(b) provides, in part:

"In any action or proceeding to enforce a provision of section[ ] * * * 1983[ ] * * * of this title, * * * the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs[.]"

Constitution as content based restrictions to the extent they depend on the distinction based on text, numbers, registered trademarks and registered logos, since the City has made no showing of any historical exception, the definitions to this extent are void, unenforceable and of no force whatsoever."

That judgment was appealed by the city.

In response to the trial court's determinations, the city amended the sign code on November 18, 1998, to eliminate the regulatory distinction between painted wall decorations and painted wall signs. It repealed the exemption of "painted wall decorations" from the requirements of the sign code as well as the definition of "painted wall decorations"; the city also amended the definition of "sign" to eliminate the reference to the sign's content. As amended, "sign" was defined as "[m]aterials placed or constructed so they can be viewed from a right-of-way or another property, and which convey a message or image." Thereafter, painted wall murals were regulated in the same way as painted wall signs. On December 2, 1998, the city repealed both of its moratoria on the issuance of painted wall sign permits.

The case proceeded to trial on the parts of plaintiff's claims not resolved by the appealed judgment, and, in 1999, the trial court concluded that the judgment on appeal deprived it of authority to determine the state constitutional law issues raised in the second and third claims for relief. However, the court decided the remaining state and federal claims,[4] and ultimately determined that, although plaintiff was not entitled to an injunction forbidding the application of the amended code to its permits, plaintiff was entitled to

---

[4] In resolving those remaining claims, the trial court concluded, among other things, that (1) the challenged distinction in the sign code based on the presence of text, numbers, registered trademarks, or registered logos was a content-based discrimination under the First Amendment because it preferred murals (without the described content) over other forms of billboards and wall signs (with the described content); (2) plaintiff's billboard applications were denied because they exceeded the size limitations in the city's amended sign code; and (3) the adjustment criteria and design review guidelines were constitutional to the extent they were interpreted and applied to refer "only to sign structure or placement, and as permitting reference to copy only to the extent of color or typeface and excluding any reference to message, category, subject, topic, or viewpoint."

damages under 42 USC section 1983 for the application of an unconstitutional sign code to it.

Both parties appealed the resulting judgment, and that appeal was consolidated with the earlier appeal of the partial judgment. However, this court determined that no final appealable judgment had been entered in the case and dismissed the appeals. *AK Media Group, Inc. v. City of Portland*, 192 Or App 204, 207, 84 P3d 1088 (2004). On remand, following a stipulation of the parties on part of the factual record and a second trial, the trial court issued an opinion and order concerning the merits of all claims in the case. That 2007 order became the basis for the judgment now under review.

In its opinion, the trial court concluded that, under Article I, section 8, the sign code (1) unconstitutionally favored one type of speech over another by exempting "painted wall decorations" in the form of murals from the regulations otherwise applied to "signs" and (2) unconstitutionally distinguished between "signs" and "painted wall decorations" on the basis of sign content—*viz.*, the presence of "text, numbers, registered trademarks, or registered logos" in the display.[5] Initially, the trial court also concluded that "invalidating the distinction [based on text, numbers, registered trademarks, or registered logos] did not leave [the court] * * * the option of simply upholding the remainder of the sign code." The trial court reasoned:

> "[O]nly by adding 'or image' or the equivalent to what was left of the definition (or by rewriting it completely) could the result cure the unconstitutionality of the sign code. And, * * * without hindsight, [the court] could not with any confidence determine how the City would resolve its strongly conflicting interests in regulating billboards on the one hand and promoting mural art on the other."

---

[5] Article I, section 8, forecloses

"the enactment of any law written in terms directed to the substance of any 'opinion' or any 'subject' of communication, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach."

*State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982).

The court therefore stated that "[it] could not merely strike the offending language, and that [it] could not redraft the sign code. In this sense, only, the code was 'void.' "

Nonetheless, the court then determined that, once the content-based distinction between "signs" and "painted wall decorations" was declared unconstitutional and legislatively removed from the sign code, plaintiff obtained all of the relief to which it was entitled under the petition for review and second amended complaint. Further, the court held that plaintiff's sign permits were denied because of the size limits in the sign code and not because of the exemption for painted wall decorations or application of the design review or adjustment standards. In the court's view, those size limits were reasonable time, place, and manner restrictions, lawful under both the state and federal constitutions, so that plaintiff was not entitled to injunctive relief requiring the city to issue the permits. According to the court, because the constitutionally infirm distinction between "signs" and "painted wall decorations" was not the cause of the permit denials, plaintiff was not damaged by any illegality under federal law; the court explained:

"Although the unconstitutional sign code was the City's basis for denying the permits, and although that code could not be cured without legislative response to the plaintiff's constitutional challenge, the size limitations which existed at the time of the initial and renewed applications were not themselves prohibited by free speech provisions of any constitution. What was unconstitutional about the previous code was not its application to plaintiff's billboards but the method by which it exempted murals. * * *

"In this context, it is as much a fiction to reason that but for the unconstitutionality of the City's sign code plaintiff would have had its billboards as it is to reason that the sign code was 'void,' did not 'exist,' and was not 'applicable' when the plaintiff resubmitted its applications.

"I cannot award damages based on the notion that but for the unconstitutionality of the sign code, plaintiff *would have had its signs*. In that sense, then, the unconstitutionality of the sign code was not a proximate cause of damages to the plaintiff, and actual damages are unavailable."

(Emphasis in original.) Accordingly, the court concluded plaintiff was not entitled to relief under section 1983 or attorney fees under section 1988.

Ultimately, the trial court entered a general judgment, awarding plaintiff a declaration, limited in its scope, that *"the Portland sign code definitions* in existence prior to November 18, 1998, based on the presence of text, numbers, registered trademarks, or registered logos, imposed regulation based on the content of speech and was therefore a violation of Article I, section 8, of the Oregon Constitution[.]" (Emphasis added.) In addition, the judgment denied plaintiff's request for an injunction and provided that "[p]laintiff shall take nothing further by its complaint in this matter"; judgment on plaintiff's remaining claims was for the city.

Although nothing in the general judgment explicitly addressed the issue of severance, by declaring only a discrete part of the sign code unconstitutional—*viz.*, the definitions—and by denying plaintiff's other requested relief, we understand the import of the trial court's judgment to have, in essence, implicitly severed those unconstitutional provisions and left the remainder of the sign code intact.[6]

### III.  ANALYSIS

On appeal, plaintiff contends that the trial court erred in failing to (1) grant an injunction requiring the issuance of its requested sign permits, (2) award damages for improper denial of those permits, and (3) allow attorney fees. Plaintiff first argues that, because the sign code that was in effect when it applied for its wall signs and billboards unconstitutionally distinguished between "signs" and "painted wall decorations" based upon the nature of the communication expressed in the display, the entire sign code was void and unenforceable. Accordingly, plaintiff contends that it is entitled to injunctive relief for the issuance of its requested permits as well as damages and attorney fees under federal law

---

[6] We note that, to the extent that the trial court's judgment may be viewed as declaring the entire sign code void, the city cross-assigns error to the trial court's failure to sever the unconstitutional provisions from the remainder of the sign code. Plaintiff counters that the city must cross-appeal in order to complain about the court's severability ruling. In light of our understanding of the trial court's judgment, we need not resolve that issue.

for the delay in issuing those permits. Plaintiff also argues that, even without the offending definitional distinction, various other provisions of the sign code—the size and height limitations, adjustment criteria, and design review guidelines—were unconstitutional under the state and federal constitutions and constituted additional grounds on which to void the entire code.

The city does not contest the trial court's conclusion regarding the unconstitutionality of the code's content-based distinction between "signs" and "painted wall decorations," and we assume the correctness of that conclusion for purposes of this opinion. Thus, the issue reduces to whether those unconstitutional parts of the sign code are severable so as to allow the application of the remaining portions of the code to plaintiff's requested permits or whether the unconstitutionality of those parts corrupts the entire code and precludes any application of that code to the permit applications.

A. *Severability of unconstitutional provisions of the sign code*

Oregon courts have long recognized the principle that an unconstitutional part of a statute or ordinance may be excised without destroying a separable part. *See, e.g., City of Portland v. Dollarhide*, 300 Or 490, 503-04, 714 P2d 220 (1986); *City of Portland v. Roth*, 130 Or App 179, 184, 880 P2d 967 (1994), *rev den*, 320 Or 507 (1995). "For acts of the Legislative Assembly, this principle has been codified at ORS 174.040[.]" *Dollarhide*, 300 Or at 504. ORS 174.040 provides:

"It shall be considered that it is the legislative intent, in the enactment of any statute, that if any part of the statute is held unconstitutional, the remaining parts shall remain in force unless:

"(1)   The statute provides otherwise;

"(2)   The remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part; or

"(3)   The remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent."

In *Dollarhide*, the court held that "[t]he same analysis should be employed to determine whether part of an ordinance, if held to be unconstitutional, should be severed from the remaining parts." 300 Or at 504.[7]

We recently discussed the issue of severability—in the context of statutory provisions—in *State v. Borowski*, 231 Or App 511, 526-30, 220 P3d 100 (2009). There, we concluded that a challenged statute violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 526. We then went on to also conclude that the statutory presumption of severability was inapplicable to salvage any portion of the statute. We stated:

"When a statute offends principles of equal protection because one part creates an entitlement (or burden) and another part withholds that entitlement (or burden) from some people, the statute does not necessarily contain an 'unconstitutional part.' * * * The issue is not exactly whether an unconstitutional part can be severed. It is, more precisely, whether the legislature would prefer to *eliminate* the exemption, so that all those who interfere with agricultural operations commit the crime, or, alternatively, would prefer to *extend* the exemption to everybody, in which case the appropriate remedy would be to do away with the statute entirely.

"*Salem College & Academy, Inc. v. Emp. Div.*, 298 Or 471, 695 P2d 25 (1985), is instructive in resolving this issue. In that case, the Oregon Supreme Court concluded that extending an exemption from paying employment tax to some religious schools but not others violated the constitutional mandate to treat all religions equally. *Id.* at 490. The court thus had the option of making the exemption universal or eliminating it entirely. It decided to eliminate the exemption:

---

[7] That conclusion results at least when a local legislative body has not adopted different policies on the severability of unconstitutional portions of its own code. Here, the city has no specific code provisions to determine the legislative intent of its council on severability, other than the general policy in PCC 1.101.160 noted later in this opinion. *See* 243 Or App at 147-48.

> " 'If [the federal unemployment statute] validly requires coverage of independent religious schools, a holding that excludes them from coverage under [Oregon law] would have consequences directly contrary to the legislature's dominant objective of maintaining Oregon's conformity with [federal law]. In a choice between exempting independent religious schools and losing conformity with [federal law] or maintaining that conformity and extending coverage to all religious schools, the legislature in 1977 surely would have chosen the latter course.'
>
> "*Id.* at 494. Thus, the decision whether to extend the exemption or eliminate it rested on a determination of which option the legislature that enacted the statute would have preferred."

*Borowski*, 231 Or App at 526-27 (emphases in original).

We gave particular consideration to that statute's legislative history (from which we inferred that the unlawful exemption had been a critical component in enacting the law), the assumption that the legislature prefers to avoid enacting a statute that raises serious questions of constitutionality, and the fact that the conduct at which the statute was primarily directed was already prohibited by existing statutes. *Id.* at 528-29. Those considerations persuaded us that, "when presented with the choice between enacting a potentially unconstitutional and almost entirely redundant statute, on the one hand, and, on the other, not enacting anything, the legislature would have opted to do nothing." *Id.* at 530. We therefore held that the entire statute was unconstitutional. *Id.*

Of particular relevance to the case at hand, the Oregon Supreme Court has also addressed the issue of severability in the context of sign regulations. *See Outdoor Media Dimensions v. Dept. of Transportation*, 340 Or 275, 132 P3d 5 (2006). In that case, particular provisions of the Oregon Motorist Information Act (OMIA) were held to violate Article I, section 8, by distinguishing between on-premises and off-premises signs and exempting on-premises signs from the OMIA's permit and fee requirements. *Id.* at 299. In determining whether and how to sever the unconstitutional parts of the OMIA from the remaining provisions, the court

noted that the remaining provisions of the OMIA, including restrictions on sign size, generally applied to all signs. The court thought that "the legislature would have wanted [those generally applicable provisions] to remain in effect, notwithstanding the unconstitutionality of the on-premises/off-premises distinction." *Id.* at 301. Thus, the court held that "the OMIA is not unconstitutional in its entirety." *Id.*

The more difficult problem in *Outdoor Media Dimensions* was not *whether* to sever but, rather, *what* to sever. The court explained:

"We can end [the constitutional] infirmity either by striking from the OMIA the exemption from the permit requirement for on-premises signs, ORS 377.735(1)(c), or by striking the permit requirement itself, ORS 377.725(1), as it applies to outdoor advertising signs (off-premises signs). In choosing between those alternatives, we are mindful of the legislature's policy statement in ORS 377.705 that the purposes of the OMIA include 'promot[ing] public safety,' 'preserv[ing] the natural beauty and aesthetic features' of state highways, and 'prohibit[ing] the indiscriminate use of * * * outdoor advertising.' However, we also are aware from the record that the number of existing on-premises signs, which do not require OMIA permits or fees, far exceeds the number of outdoor advertising signs, which do require permits and fees. We thus find ourselves faced with the same two unpalatable choices that the legislature would face: permitting sign owners to display 'off-premises' (outdoor advertising) signs without obtaining the permits required by the OMIA, or imposing new permit and fee requirements on thousands of individuals and businesses that now have on-premises signs. We think that, faced with that choice, the legislature would not have been willing to extend the OMIA's permit and fee requirements to the large category of new and existing on-premises signs. Accordingly, we conclude that the appropriate remedy in light of our holding is to strike from the OMIA the permit and fee requirements for outdoor advertising signs, ORS 377.725(1)."

*Id.* at 301-02 (footnote omitted).

*Outdoor Media Dimensions* and *Borowski* demonstrate that, at bottom, whether an unconstitutional legislative provision should be severed is a matter of the legislative intent of the enacting body—here, the Portland City Council.

As an initial matter, PCC 1.101.160 states the council's intent with respect to severability of provisions of the city code:

> "If any Section, Subsection, sentence, clause or phrase of this Code is for any reason held to be invalid or unconstitutional, such decision shall not affect the validity of the remaining portions of this Code. The Council hereby declares that it would have passed this Code, and each Section, Subsection, sentence, clause, and phrase thereof, irrespective of the fact that any one or more Sections, Subsections, sentences, clauses, or phrases may be declared invalid or unconstitutional, and, if for any reason this Code should be declared invalid or unconstitutional, then the original ordinance or ordinances shall be in full force and effect."

In light of that explicit statement, we readily conclude that the council would have wanted the nonoffending provisions of the city code to remain in effect, notwithstanding the unconstitutionality of the distinction between "sign" and "painted wall decoration."

That conclusion, however, does not end our inquiry; we still face the same difficult problem that confronted the Supreme Court in *Outdoor Media Dimensions*—namely, *what* provisions of the city code should be severed. Plaintiff argues that, because the defectively defined term "sign" permeates the city's sign regulations, the entirety of the city's sign code—PCC chapter 33.286[8]—is void. Plaintiff's argument, consequentially, advocates for severance in its most extreme form—*i.e.*, severing PCC chapter 33.286 in its totality from the remainder of the city code. The city, by contrast, argues that severing the exemption for "painted wall decorations," PCC 33.286.040(E), and the relevant unconstitutional parts of the definitions of "sign" and "painted wall decoration" is sufficient to cure the constitutional defect, while leaving intact the city's comprehensive regulations of sign sizes, locations, materials, and the like.

---

[8] We refer throughout the remainder of this opinion to the versions of the city's sign code and related definitions in existence prior to November 18, 1998, the day the city amended its sign code to eliminate the regulatory distinction between painted wall decorations and painted wall signs.

Regarding the definitions of "sign" and "painted wall decoration"—the discrete provisions that the trial court declared unconstitutional in its judgment—we conclude that the sentences in those definitions that refer to "text, numbers, registered trademarks, or registered logos" are severable. The council adopted those sentences as a discrete amendment to the sign code in 1991, in order to make more objective the classification of murals and signs. Because the council had previously adopted the unamended versions of those definitions, we are confident that the council would have wanted the definitions to revert back to their prior versions if the amendment itself was held to be unconstitutional. As a result of excising that amendment, the sign code is not left unenforceable because it is devoid of a definition of "sign."

To the extent that the general judgment also may be construed as declaring unconstitutional the code's "painted wall decoration" exemption, the remaining issue is whether the council would have preferred to strike that exemption from the sign code, on the one hand, or would have preferred to extend that exemption to all signs, on the other. For the reasons that follow, we do not believe that the council would have intended to make the exemption universal.

As found by the trial court, the city has a long-standing and nationally recognized interest in zoning and land use regulation. The city's sign regulations sought to "balance the need to protect the public safety and welfare, the need for a well maintained and attractive community, and the need for adequate identification, communication and advertising for land uses." PCC 33.286.010 (stating the purpose of the sign regulations). Specific objectives of the sign code included (1) ensuring signs are designed, constructed, installed, and maintained so that public safety and traffic safety are not compromised; (2) allowing and promoting positive conditions for signs, while simultaneously avoiding nuisances and promoting an attractive environment; (3) reflecting and supporting the character and development patterns of various zones and plan districts; (4) allowing adequate and effective signs in commercial and industrial areas, while preventing signs from dominating the appearance of the area; and (5) ensuring that the constitutional right of free speech is protected. *Id.* Since 1986, in response to litigation determining

that provisions of the city's sign regulations had constitutional defects, the city has made a variety of changes to its sign code in attempts to bring those regulations into conformity with the law. There is no evidence in the record that, at any point, the city has acted to deregulate signs *in toto* in order to comply with constitutional standards.

In addition, the circumstances in this case are unlike those in *Borowski*. There, other constitutional criminal statutes prohibited the same conduct that had been the focus of the invalidated and redundant statute. Here, the city's sign code is not duplicative of any other regulations enacted by the city regarding the zoning of signs. Put another way, severing PCC chapter 33.286 from the city code would not have left other regulations in place to effectuate the city's objectives in regulating sign sizes, locations, or materials.

Further, evidence in the record demonstrates that, while this litigation was pending in late 1998, the total number of signs subject to the city's regulations exceeded 30,000. In contrast, the parties agree that only approximately 50 murals were exempted from regulation at that time. Thus, the ratio of regulated signs to exempted murals was approximately 6,000 to 1. That ratio is quite removed from the situation in *Outdoor Media Dimensions*. In that case, the court considered the practical effect of severing from the OMIA an exemption for on-premises signs; the court noted that doing so would extend the OMIA's permitting and fee requirements to thousands of formerly unregulated signs. Unsurprisingly, the court concluded that the legislature would not have been willing to extend the permit and fee requirements to such a large category of signs. 340 Or at 302. Here, a comparably small number of signs—the murals—would be affected by severing the exemption. We cannot say that such a result, in these circumstances, would have been so unpalatable to the city council that it would have overridden the council's longstanding objectives in regulating the thousands of other subject signs in the city.

We therefore conclude that the exemption for "painted wall decorations" is severable from the city's sign code. Accordingly, because the offending parts of the city's sign code are severable, the sign code is not void in its

entirety. As a result, the city is not culpable in applying other parts of the sign code to deny plaintiff's requested sign permits, unless those particular parts of the code are themselves unconstitutional in their promulgation or application.

B. *Time, place, and manner restrictions*

In that regard, plaintiff argues that it was entitled to relief under both Article I, section 8, and the First Amendment because, in denying plaintiff's billboard and painted wall sign permit requests, the city applied provisions of its code that unconstitutionally limited the size and height of signs. As indicated above, the sign code, *see* PCC 33.286.100, provided that the maximum area allowed per sign was 200 square feet and the maximum height was 25 feet. 243 Or App at 137.

According to plaintiff, because the city fails to identify the forbidden effects targeted by the size and height restrictions and fails to establish that all oversize signs uniformly cause the alleged (and unidentified) forbidden effects, the city cannot rely on its size and height limitations as valid time, place, and manner restrictions under Oregon law. Plaintiff's argument invokes the familiar framework established by the Oregon Supreme Court in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982), for evaluating whether a law violates Article I, section 8. That framework was recently summarized in *State v. Moyer*, 348 Or 220, 229, 230 P3d 7, *cert den*, ____ US ____ , 131 S Ct 326 (2010):

"First, laws that are directed to the *substance* of any opinion or any subject of communication violate Article I, section 8,

" ' "unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach." '

"[*State v. Plowman*, 314 Or 157, 164, 838 P2d 558 (1992), *cert den*, 508 US 974 (1993)] (quoting *Robertson*, 293 Or at 412). Second, laws that focus on proscribing the pursuit or accomplishment of forbidden *results* are divided further into two categories: (a) laws that focus on forbidden effects, but expressly prohibit expression used to achieve those effects, which are analyzed for overbreadth; and (b) laws

that focus on forbidden effect, but do not refer to expression at all, which are analyzed for vagueness or for as-applied unconstitutionality. *Plowman*, 314 Or at 164."

(Emphases in original.)

Plaintiff also contends that the city's reliance on First Amendment reasonable time, place, and manner jurisprudence is problematic because the city's regulations aim to eliminate billboards from the city entirely and billboards are irreplaceable as a means of communication. In *Ward v. Rock Against Racism*, 491 US 781, 791, 109 S Ct 2746, 105 L Ed 2d 661, *reh'g den*, 492 US 937 (1989), the United States Supreme Court explained that, under the First Amendment,

"the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'"

(Quoting *Clark v. Community for Creative Non-Violence*, 468 US 288, 293, 104 S Ct 3065, 82 L Ed 2d 221 (1984).) We understand plaintiff to contend that the city's size and height restrictions do not meet the last of those requirements because they fail to leave open ample alternative channels for communication.

With respect to the size restrictions, the trial court, on remand, concluded that "the City's sign code is a reasonable time, place, and manner regulation of signs, and any inadequacy of alternatives in a constitutional sense is many years away and would occur if at all in a far different mix of practical considerations than that which now exists." In support of those conclusions, the trial court relied on the Oregon Supreme Court's decision in *Outdoor Media Dimensions*.

In that case, the Oregon Supreme Court recognized the constitutionality of reasonable time, place, and manner restrictions on expression under Article I, section 8. *Outdoor Media Dimensions*, 340 Or at 288-92. Initially, the court observed that, "[b]ecause content-neutral time, place, and

manner restrictions focus on the accomplishment of 'forbidden results,' but do so by restricting expression, such restrictions appear to come within the second of the three *Robertson* categories." *Id.* at 288. The court then elaborated on the proper analysis of such restrictions under the OMIA:

> "Notwithstanding the facial validity and content neutrality of the OMIA (other than the on-premises/ off-premises distinction), petitioner argues that the fee requirement, as applied, is invalid because it 'deters' speech. Of course, even a minimal fee or tax, at the margin, tends to reduce the level of the activity to which it applies. The real question, however, is whether the fee requirement suppresses speech in such a way that it 'restrains' the free expression of opinion or 'restricts' the right to speak freely on any subject, as protected by Article I, section 8. * * * Here, as noted, [the OMIA] expressly ties the fee to the cost of the regulatory program, and petitioner does not argue that the fee is unreasonable or exceeds the cost of the program. On this record, we cannot conclude that the fee requirement is an impermissible restriction on speech.

> "Finally, petitioner argues that the OMIA's permit requirement, as applied, so burdens protected expression that it violates Article I, section 8. * * * In this case, it is apparent that, by limiting the number of outdoor advertising sign permits to the number of signs that existed in commercial and industrial zones in 1975, the OMIA was intended to, and does, cap the number of those signs that are visible from public highways. Petitioner appears to assert that the fact that it must obtain a permit lawfully to display its signs and that the number of permits is limited means that the OMIA necessarily violates Article I, section 8.

> "We disagree. Outdoor advertising signs, like other forms of expression, may have characteristics that make them uniquely suited to conveying certain messages to certain audiences. If the state were to prohibit billboards—or some other form of expression—entirely, then perhaps there would be reason to consider whether the effect of such a ban 'restrain[ed] the free expression of opinion' or 'restrict[ed] the right to speak, write, or print freely' under Article I, section 8. But the OMIA differs fundamentally from [a] complete ban * * *. The OMIA allows as many outdoor advertising signs (off-premises signs) as existed

on June 12, 1975, as well as potentially thousands of on-premises signs. Petitioner has ample avenues to communicate its messages, both on highway signs and by other means. On this record, the permit and fee requirements do not unconstitutionally restrain the free expression of opinion or restrict the right to speak, write, or print freely on any subject whatsoever."

*Id.* at 290-92 (footnote and citation omitted).

Although the court in *Outdoor Media Dimensions* recognized that content-neutral time, place, and manner restrictions "appear" to fall within the second category of the *Robertson* framework, the court's subsequent discussion of the constitutionality of the OMIA permit and fee requirements did not follow a typical *Robertson* category two analysis (applying to laws that focus on forbidden effects, but expressly prohibit expression used to achieve those effects). *See City of Portland v. Tidyman*, 306 Or 174, 184-86, 759 P2d 242 (1988) (requiring that, under category two of *Robertson*, the operative text of the restriction regulating the effects of speech of a particular content must specify the adverse effects sought to be avoided and ban the expression only when the speech causes that harm or is imminently likely to do so). That departure from the typical analysis may have been precipitated by the regulations in question in *Outdoor Media Dimensions* themselves, which did not classify on the basis of the harmful effects of speech of a *particular content*, but rather on the *noncommunicative elements* of the speech. For that reason, we understand that the court's analysis in *Outdoor Media Dimensions* focused on the interest of the government served by the content-neutral permit and fee requirements (defraying the regulatory costs) and the reasonableness of those requirements, including the availability of alternative channels of communication. *See City of Eugene v. Miller*, 318 Or 480, 491, 871 P2d 454 (1994) (the court reviewed a content-neutral regulation of street vending, allowing only the vending of certain commodities on city streets, under Article I, section 8, to determine whether there was a "rational basis for the burden * * * on expressive activity"). We apply the same test in this case.[9]

_____

[9] We have also applied a similar analysis in *State v. Rich*, 218 Or App 642, 647, 180 P3d 744 (2008), where we concluded that a statute that regulated

Here, the city has expressed its objectives in regulating signs in PCC 33.286.010. As noted above, those objectives include inhibiting the compromise of public and traffic safety, avoiding nuisances, and preventing signs from dominating the appearance of commercial and industrial areas. The city has sufficiently identified its interest in regulating sign size. Further, to the extent that plaintiff's argument contends that the size and height restrictions are unreasonable because they amount to a total ban on billboards that fails to leave adequate alternative channels of communication, we disagree.

At the time of the decision on remand, the trial court found that plaintiff had access to 499 structures for its oversized signs (as nonconforming uses), accounting to 692 "faces," which were typically changed monthly, for a total of 8,304 messages per year. In addition, other channels of communication, such as smaller signs, radio, and television, were available to plaintiff. As explicitly determined by the trial court, plaintiff had ample avenues of communication by which to disseminate its messages. It may be that, over time, the effect of the city's size and height restrictions on signs will result in the preclusion of bulletin-sized and poster-sized billboards due to the attrition of such oversized structures. However, to the extent that that preclusion implicates an issue about whether there will be adequate alternative avenues of communication in the future, that issue is speculative and cannot be the basis of relief at this time. The city's restrictions on sign size and height are reasonable time, place, and manner restrictions that do not violate Article I, section 8.

The same reasoning applies with respect to the validity of the size and height restrictions under the First

---

"unreasonable noise" fell within the third *Robertson* category as a time, place, and manner restriction, subject only to as-applied constitutional challenges. We explained:

> "[W]e interpret the term 'unreasonable noise' in the statute, insofar as it might refer to noise caused by speech, to refer only to its noncommunicative elements. The statute, in other words, prohibits noise that is 'unreasonable' in volume, duration, etc. It is a classic time, place, or manner law. If the regulated noise happens to be speech, then enforcement is unconstitutional only if the enforcement is directed toward the speech's content and not its noncommunicative elements."

*Id.* (citation omitted).

Amendment. *See City of Ladue v. Gilleo*, 512 US 43, 48, 114 S Ct 2038, 129 L Ed 2d 36 (1994) ("It is common ground that governments may regulate the physical characteristics of signs—just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise."); *Reed v. Town of Gilbert, Ariz.*, 587 F3d 966, 981 (9th Cir 2009) (holding that, under the First Amendment, a provision of the town's sign ordinance regulating the size, number, hours of display, location, and construction of "qualifying event" signs was a content-neutral regulation of the time, place, and manner of display of the plaintiffs' signs; the provision was narrowly tailored to further the town's significant interests in aesthetics and traffic safety; and the plaintiffs had ample alternative channels of communicating their message); *Get Outdoors II, LLC v. City of San Diego, Cal.*, 506 F3d 886, 893-94 (9th Cir 2007) (recognizing that "[s]ize and height restrictions * * * are evaluated as content-neutral time, place and manner regulations" and upholding the City of San Diego's size and height restrictions on billboards, where the stated purpose of the city's sign code was "to optimize communication and quality of signs while protecting the public and the aesthetic character of the City," the size and height restrictions were not substantially broader than necessary to protect those interests, and the restrictions left open alternative channels of communication).

C.  *Adjustment criteria and design review regulations and guidelines*

Beyond those size and height restrictions, however, plaintiff also argues that various other provisions of the city code are facially unconstitutional and also were applied to deny its permit applications. Specifically, plaintiff contends that the sign adjustment criteria and design review regulations and guidelines are impermissibly content-based, or, alternatively, are facially overbroad and lack adequate standards to guide the city's exercise of discretion in issuing permits. The city responds that those provisions do not regulate the content of speech, can be given a narrowing construction to the noncontent aspects of sign design, do not allow the exercise of unbridled discretion by the city, and are readily

severable, should they be found to be unconstitutional in any particular.

Because doing so will provide helpful context, we briefly describe the adjustment criteria, the design review process, and the relationship between the two schemes. Under the city's sign code, sign adjustments, *i.e.*, variances for otherwise impermissible signs, "are intended to allow flexibility to the sign regulations while still fulfilling the purpose of the regulations." PCC 33.286.240(A). Sign adjustments fall into two broad categories—those granted for area enhancement or those allowed due to site difficulties. PCC 33.286.240(C). Only the first category, under which plaintiff sought adjustments, is relevant here.

Adjustments for area enhancement are allowed if,

"a.     The adjustment for the proposed sign will not significantly increase or lead to street level sign clutter, to signs adversely dominating the visual image of the area, or to a sign which will be inconsistent with the objectives of a specific plan district or design district; and

"b.     The sign will not create a traffic or safety hazard; and

"c.     The adjustment will allow a unique sign of exceptional design or style which will enhance the area or which will be a visible landmark; or

"d.     The adjustment will allow a sign that is more consistent with the architecture and development of the site."

PCC 33.286.240(C)(1). An applicant must meet the criteria of subparagraphs (a) and (b) and either (c) or (d) in order to be allowed an adjustment for area enhancement. *Id.*

In contrast to sign adjustments, design review is not directed specifically at signs, but rather applies to any structure located in the city's design review zoning districts. Design review, therefore, is an independent process triggered by a proposed sign's location, not its compliance with the sign code. As a result, the trial court appropriately reasoned in the remand proceedings that "[t]he design review process and its criteria presented an additional hurdle which the plaintiff would have to overcome to obtain its permits[.]" The design review guidelines relevant in this case include whether the

structure will "[s]trengthen the continuity of the Central City by using existing elements and/or adding new elements that unify and connect individual areas"; "[e]nhance the identity of Special Districts by incorporating small scale features that add to the District's identity and ambiance"; "[e]mbellish with elements that build district character and respect district traditions"; "[c]ontribute to the cityscape by providing a stage for action"; and "[a]chieve design compatibility between new and existing buildings by using a design vocabulary that adds to the identity and character of an area."

In the initial proceedings below, the trial court determined that plaintiff's applications were denied because plaintiff "sought vastly (in the case of bulletins and many posters) or substantially (some posters) to exceed the permitted size" and that the denials were unrelated to the content of the proposed signs. As a result, the court rejected plaintiff's as-applied constitutional challenge to the adjustment criteria and design review process, noting that "plaintiff has an argument only if it can complain of *potential* abuse"—*i.e.*, a facial constitutional challenge. (Emphasis in original.) The court then considered plaintiff's various facial attacks on the design review process and adjustment criteria, rejecting each in turn.

On remand, the trial court adhered to its earlier determination that the city denied all of plaintiff's applications because they sought "vastly" or "substantially" to exceed the sign code's size limitation. Moreover, the trial court did not revisit or otherwise modify its conclusions regarding plaintiff's facial challenges; we thus understand the trial court to have adhered to its earlier conclusions on those matters.

1. *Content-based facial challenge to adjustment criteria*

We first consider plaintiff's facial challenges to the adjustment criteria. To recall, those criteria focus on whether the sign adjustment will significantly increase or lead to "street level sign clutter," "signs adversely dominating the visual image of the area," or "a sign which will be inconsistent with the objectives of a specific plan district or design district," whether the sign will "create a traffic or safety hazard," whether the sign is "unique" and "of exceptional design or

style," and whether the permitted sign will be "more consistent with the architecture and development of the site." Although those criteria all explicitly regulate a medium for expression (*i.e.*, signs), the criteria do not, on their face, discriminate among signs on the basis of content (*i.e.*, message, category, subject, topic, or viewpoint), despite plaintiff's protestations to the contrary. However, such facially content-neutral regulations nonetheless may be impermissibly overbroad or lacking objective and narrow standards so as to *implicitly* allow content-based regulation of speech; we turn next to consider those issues.

### 2. *Overbreadth facial challenge to adjustment criteria*

In *Outdoor Media Dimensions*, the court explained that, under Article I, section 8,

"[if] the statute is unconstitutional because it is 'overbroad' and prohibits constitutionally privileged expression as well as expression that the legislation lawfully may punish or prohibit, then the court examines the statute to determine whether a 'narrowing construction' of the statute is possible, or whether the 'needed narrowing cannot be accomplished by judicial interpretation,' and the legislature instead must undertake it."

340 Or at 300 (internal citations omitted). Any narrowing construction, judicially adopted to address a law's potential overbreadth, "must keep faith with the [legislative body's] policy choices, as reflected in the [law's] words, and respect the [legislative body's] responsibility in the first instance to enact laws that do not intrude on the constitutionally protected right of free speech." *State v. Rangel*, 328 Or 294, 304, 977 P2d 379 (1999).

In determining whether a narrowing construction is appropriate to avoid invalidating a law as overbroad, we are mindful of the "sharp distinction between judicial interpretation, which is permissible, and redrafting, which is not." *City of Salem v. Lawrow*, 233 Or App 32, 39, 225 P3d 51 (2009). As we further explained in *Lawrow*,

"[i]nterpretation includes choosing from among competing definitions, resolving ambiguities, or explicating the meaning of the terms in the enactment. Redrafting, on the other hand, includes completely eliminating a word, phrase, or

> concept that the original text clearly and intentionally includes or adding a completely new word, phrase, or concept that it does not, contrary to ORS 174.010 (judges are 'not to insert what has been omitted, or to omit what has been inserted')."

*Id.* at 39-40. Thus, in *Lawrow*, we declined to impose a construction on an ordinance that would have deleted a particular textual phrase and amended a particular word choice made by the enacting body, concluding that such "judicial surgery" was not possible because "nothing in the record implie[d] that those who enacted the ordinance intended it to have the narrow focus that would result from the suggested alterations" and "[i]mposing the suggested changes * * * would require redrafting." *Id.*

Here, to the extent that the adjustment criteria have the effect of prohibiting expression, that prohibition is legitimate so long as it is based on content-neutral considerations. The question therefore becomes whether the adjustment criteria incurably reach beyond that legitimate area of regulation.

The source of any potential unconstitutional overbreadth in the criteria is their focus on features of the proposed "sign" and how the proposed "sign" will integrate into the surrounding environment. As we discussed above, the city council explicitly defined "sign" for purposes of the code. In light of our severability analysis, that definition is reduced to "[m]aterials placed or constructed primarily to convey a message and which can be viewed from a right-of-way or another property." So defined, "sign" refers first to certain "materials" and second to the expressive purpose served by those materials.

Were that definition viewed in a vacuum, the adjustment criteria plausibly could be interpreted to include consideration of the subject or viewpoint of the message conveyed by the "sign"—*i.e.*, its content—in determining whether, for example, the sign poses a traffic or safety hazard or is of exceptional design or style; such an interpretation would render the adjustment criteria unconstitutionally overbroad. Context, however, makes clear that the criteria refer only to consideration of the materials that make up the

"sign"—*i.e.*, its nonexpressive, physical features—and not its content. PCC 33.286.030 specifically provides, "This chapter states the standards for the number, placement, and physical characteristics of signs. The regulations do not restrict the content of signs." As has been observed before, "[w]e have the responsibility to interpret enactments, if possible, to avoid overbreadth." *Lawrow*, 233 Or App at 39 (citing *Robertson*, 293 Or at 417-18, 436-37). We therefore interpret the adjustment criteria to require consideration only of the proposed sign's objective, nonexpressive physical features, and to exclude any consideration whatever of the subjective content of the sign's message.[10] The adjustment criteria are not fatally overbroad under Article I, section 8.

Given that analysis, we reach the same conclusion in examining the adjustment criteria for overbreadth under the First Amendment. *See United States v. Stevens*, ___ US ___, ___, 130 S Ct 1577, 1587, 176 L Ed 2d 435 (2010) ("[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." (Citation and internal quotation marks omitted.)); *id.* at ___, 130 S Ct at 1591-92 (a limiting construction can be imposed on a regulation only if it is readily susceptible to such construction; a court may not rewrite the regulation to conform to constitutional requirements, because doing so would constitute a serious invasion of the legislative domain and sharply diminish any incentive for the legislative body to draft a narrowly tailored law in the first place).

---

[10] We note that, apart from "sign," the city code separately defines "sign structure" as "[a] structure specifically intended for supporting or containing a sign." PCC 33.910 (Sign-Related Definitions). Despite that apparent attempt to give "sign" and "sign structure" separate meanings of independent significance, the code also categorizes certain types of signs depending on the character of their structures, thereby appearing to acknowledge that a "sign" consists of both the materials that make up the message display as well as the materials that support or contain that display. For example, an "abandoned sign" is "[a] sign structure that does not contain a sign for 120 continuous days or a sign not in use for 120 continuous days"; a "freestanding sign" is "[a] sign on a frame, pole, or other support structure which is not attached to any building"; and, as has been noted above, a "painted wall sign" is "[a] sign applied to a building wall with paint and which has no sign structure." PCC 33.910 (Sign-Related Definitions). For our purposes in resolving plaintiff's overbreadth and prior restraint facial challenges to the adjustment criteria, however, we need not—indeed, we do not—determine whether "sign" and "sign structure" are mutually exclusive terms.

### 3. *Prior restraint facial challenge to adjustment criteria*

Next, we consider plaintiff's argument that the adjustment criteria constitute unconstitutional prior restraints on speech. Although plaintiff invokes both the state and federal constitutions, plaintiff's argument at this juncture relies solely on case law interpreting the requirements of the First Amendment. We decline to engage in an independent prior restraint analysis under the Oregon Constitution where plaintiff has insufficiently developed an argument to that effect. Accordingly, we turn now to the protections afforded by the First Amendment.

As an initial matter, we observe that the parties appear to assume that the challenged criteria authorize the suppression of speech in advance of its expression, so as to raise concerns under the First Amendment prior restraint doctrine. Here, however, the adjustment process is not used to deny a requested sign permit. Rather, a size adjustment is sought to vary the terms of a sign permit. *See Ward*, 491 US at 795 n 5 (a sound-amplification guideline that granted no authority to forbid speech, but merely permitted the city to regulate volume to the extent necessary to avoid excessive noise, was not a prior restraint of speech that authorized the suppression of speech in advance of its expression). Nonetheless, assuming without deciding that the adjustment criteria do authorize the suppression of speech in advance of its expression, thereby constituting a prior restraint on speech, the question that remains is whether that restraint is unconstitutional.[11]

---

[11] In its initial discussion of the sign code's constitutionality under the federal constitution, the trial court also noted the issue of whether the adjustment criteria were susceptible to a prior restraint analysis, explaining:

"It might well be argued that because this 'restraint,' unlike the moratoria, operates only on oversized signs, there can be no prior restraint attack on the adjustment or review guidelines * * *. As applied to a business entitled to a sign of a given size as a matter of right, that allowing a larger sign involved discretion would not invoke prior restraint analysis. I assume for this analysis, however, that the status of billboards as a channel of speech renders adjustment and review requirements triggered by the size of billboards the equivalent of licensing and therefore not exempt from prior restraint analysis."

*See Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F3d 1358, 1361 (11th Cir 1999), *cert den*, 529 US 1053 (2000) (where an adult entertainment establishment had to apply for an exception to a zoning ordinance in order to operate at 93 out of

"Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." *Thomas v. Chicago Park Dist.*, 534 US 316, 323, 122 S Ct 775, 151 L Ed 2d 783 (2002). Indeed, the Supreme Court has stated that "[a] government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." *Forsyth County v. Nationalist Movement*, 505 US 123, 130, 112 S Ct 2395, 120 L Ed 2d 101 (1992) (citation and internal quotation marks omitted). Thus, a content-neutral permitting scheme regulating the time, place, and manner of speech must contain "adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas*, 534 US at 323 (citation omitted). In addition, a regulation's implicit limiting construction affects the constitutional analysis only to the extent that it is "made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood v. Plain Dealer Publishing Co.*, 486 US 750, 770, 108 S Ct 2138, 100 L Ed 2d 771 (1988) (citations omitted); *see also Santa Monica Food Not Bombs v. Santa Monica*, 450 F3d 1022, 1035 (9th Cir 2006) (stating same).

The prior restraint analyses of three cases from the Ninth Circuit are helpful in their reasoning. In *Desert Outdoor Advertising v. City of Moreno Valley*, 103 F3d 814, 819 (9th Cir 1996), *cert den*, 522 US 912 (1997), the court invalidated a permit requirement in a city's sign ordinance as an unconstitutional prior restraint. The ordinance stated that the issuance of a sign permit by city officials was subject to findings that "such a display will not have a harmful effect upon the health or welfare of the general public and will not be detrimental to the welfare of the general public and will not be detrimental to the aesthetic quality of the community or the surrounding land uses." *Id.* at 817. The Ninth Circuit concluded that the ordinance

95 available sites, the exception was the equivalent of a license and subject to the prior restraint doctrine).

"contains no limits on the authority of City officials to deny a permit. City officials have unbridled discretion in determining whether a particular structure or sign will be harmful to the community's health, welfare, or 'aesthetic quality.' Moreover, City officials can deny a permit without offering any evidence to support the conclusion that a particular structure or sign is detrimental to the community."

*Id.* at 819.

By contrast, in *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F3d 895, 904 (9th Cir 2007), the Ninth Circuit rejected a prior restraint challenge to another city's sign ordinance, concluding that restrictions in the ordinance sufficiently cabined the city official's discretion in granting permits. In that case, a permit was required for any sign not expressly exempted from the permit scheme. The city's planning director was instructed that his review in issuing permits was to "ensure that any sign proposal is in conformance with this Chapter and is consistent with its intent and purpose." The city's delineated intent and purpose included encouraging "a desirable urban character which has a minimum of overhead clutter," enhancing the "economic value of the community and each area thereof through the regulation of the size, number, location, design and illumination of signs," and encouraging "signs which are compatible with on-site and adjacent land uses." Among other things, the ordinance also required all signs to be "compatible with the style or character of existing improvements upon lots adjacent to the site," including incorporating specific visual elements such as type of construction materials, color, or other design detail. *Id.* (citations and internal quotation marks omitted). Having reviewed those criteria, the Ninth Circuit held that

"[t]he Director's discretion is not unlimited, but cabined by specific findings regarding the relationship of the sign to the site, the freeway, and other signs in the area. The compatibility requirement delineates fairly specific criteria regarding the relationship between the sign and the site. Although the design review criteria are 'somewhat elastic and require reasonable discretion to be exercised by the permitting authority, this alone does not make the Sign Code an unconstitutional prior restraint.' "

*Id.* at 904-05 (internal citations omitted).

Moreover, in *Desert Outdoor Advertising v. City of Oakland*, 506 F3d 798, 806 (9th Cir 2007), the plaintiff unsuccessfully argued that a sign ordinance, as amended, unconstitutionally granted the city officials undue discretion to permit or deny sign variances, thereby constituting a prior restraint. The city's code banned the construction of new advertising signs anywhere within the city. Variances to that ban were granted under the ordinance only where (1) strict compliance with the ban would "result in practical difficulty or unnecessary hardship inconsistent with the purposes of the zoning restrictions, due to unique physical or topographic circumstances or conditions of design"; (2) strict compliance would "deprive the applicant of the privileges enjoyed by owners of similarly zoned property"; and (3) the variance would not "constitute a grant of special privilege." *Id.* at 801. The Ninth Circuit concluded that the second and third conditions turned on objective inquiries and that the first condition, while less concrete, was sufficiently constrained by a reasonably specific limitation. *Id.* at 807. In upholding the ordinance, the court stated:

> "[The ordinance's] criteria are significantly more concrete than the abstract 'aesthetic' standards invalidated in *Moreno Valley*. The provisions of [the ordinance] are 'somewhat elastic' and require 'reasonable discretion to be exercised by the permitting authority,' but this 'does not make [the ordinance] an unconstitutional prior restraint.' Satisfied that [the ordinance] 'contains appropriate standards cabining the [City's] discretion,' we agree with the district court that the ordinance is constitutional as amended."

*Id.* (internal citations omitted; third and fifth alterations in original; other alterations added).

Returning to the instant case, we conclude that the sign adjustment criteria, having been given a binding narrowing construction above, are sufficiently objective and specific in their limitations so as to sufficiently constrain the discretion of city officials. As construed, the criteria do not allow city officials to consider the subjective content of a proposed sign in determining whether to grant an adjustment. Rather, the inquiry under the adjustment criteria focuses on the objective, physical aspects of the sign and the extent to which the proposed sign, so viewed, would significantly increase

street level sign clutter, adversely dominate the visual image of an area, be inconsistent with plan or design district objectives, create traffic or safety hazards, be of exceptional design or style so as to enhance an area or be a visible landmark, and be more consistent with site architecture and development. Although the adjustment criteria exhibit a range of elasticity, requiring at times more or less discretion to be exercised by the permitting authority, we cannot say that the criteria are on par with the overly generic inquiry into whether a proposed sign would have a harmful effect on public health, welfare, and aesthetic that was invalidated in *Moreno Valley*. Simply put, that the adjustment criteria require an exercise of discretion by city officials is not fatal where that discretion is based on objective considerations and fairly specific limitations. Those types of regulations "pose no danger of official censorship." *Outdoor Media Dimensions*, 340 Or at 286 (holding that the permit and fee requirements of the OMIA did not constitute impermissible prior restraints on expression in violation of Article I, section 8).

### 4. *As-applied challenge to adjustment criteria*

Having determined that the adjustment criteria are not facially unconstitutional in any respect, we observe that plaintiff has not developed any independent argument that the criteria are unconstitutional as applied to its permit applications. For that reason, we do not address that issue.

### 5. *Challenge to the design review process*

Finally, because we have concluded that plaintiff's signs were denied under the sign code and because the provisions of the code on which the city based those denials (the size and height restrictions and adjustment criteria) were constitutional, we also need not reach the issue raised by plaintiff regarding the constitutionality of the design review regulations and guidelines. Whether the design review process is unconstitutional—either facially or as applied—is simply irrelevant, where plaintiff's permits were denied on other, independent, constitutional grounds.

## IV. CONCLUSION

Given the above analysis, plaintiff has not demonstrated that it was ever entitled to the issuance of permits for

its requested, oversized signs. Consequently, the trial court did not err in denying plaintiff its requested injunction, damages, or attorney fees. Plaintiff has obtained all the relief to which it is entitled: a declaration that "the Portland sign code definitions in existence prior to November 18, 1998, based on the presence of text, numbers, registered trademarks, or registered logos, imposed regulation based on the content of speech and was therefore a violation of Article I, section 8, of the Oregon Constitution[.]"

Affirmed.